**SUN OIL COMPANY, the Superior Oil Company and Marathon Oil Company**

v.

**The UNITED STATES.**

No. 806–71.

United States Court of Claims.

Feb. 22, 1978.

---

Henry P. Sailer, Washington, D. C., for Sun Oil Co.; Theodore L. Garrett, Covington & Burling, Washington, D. C., of counsel.

Edgar H. Brenner, Washington, D. C., for The Superior Oil Co.; Abe Krash, James A. Dobkin, David Bonderman, Arnold & Porter, Washington, D. C., Willard B. Wagner, Jr., and R. W. Dye, Houston, Tex., of counsel.

Richard A. Baenen, Washington, D. C., for Marathon Oil Co.; Patricia L. Brown and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Myles E. Flint, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant; Andrew F. Walch, Washington, D. C., of counsel.

Before DAVIS, Judge, Presiding, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiffs' motion, filed November 7, 1977, moving that the court adopted, as the basis for its judgment in this case, the recommended decision of Trial Judge Thomas J. Lydon, filed July 15, 1977, pursuant to Rule 134(h), on liability, defendant having failed to file exceptions thereto within the time provided therefor and having by letter of November 1, 1977, informed the trial judge that it would not file exceptions. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,[*] it hereby grants plaintiffs' motion and adopts the said decision as the basis for its judgment in this case. Therefore, the court concludes as a matter of law that plaintiffs are not entitled to any recovery relative to the installation of Platform Hillhouse on the west side of Tract 401 under their lease with defendant and their petitions in this regard are dismissed. The

court further concludes as a matter of law that plaintiffs are entitled to recover damages for defendant's breach of plaintiffs' lease rights relative to installation of Platform Henry on the east side of Tract 401, and judgment is entered for plaintiffs to that effect, with the determination of the exact amount of recovery to be made in further proceedings under Rule 131(c). Plaintiffs' petitions setting forth an alternative taking theory of recovery relative to installation of Platform Henry are accordingly dismissed.

### OPINION OF TRIAL JUDGE

LYDON, Trial Judge: This is an action by three major oil companies seeking to recover damages and/or just compensation emanating from an oil and gas lease which the companies, as a group, obtained from the Department of the Interior (Interior) on April 1, 1968. Interior granted the lease on the authority of the Outer Continental Shelf Lands Act, 67 Stat. 462 (1953), 43 U.S.C. § 1331–43 (1970). Under the lease, plaintiffs paid $38,380,032 for the exclusive right to drill for, remove and dispose of all oil and gas (hydrocarbons) deposits from lease Tract OCS–P–0240 (known as Tract 401) in the Santa Barbara Channel off the coast of California. Tract 401 was located on the Outer Continental Shelf Lands (OCSL) approximately 7½ miles southeast of the City of Santa Barbara.

Tract 401 embraced two major oil and gas fields, the Dos Cuadras field and the Carpinteria field. Plaintiffs' claims herein center on their efforts to construct two platforms on Tract 401 in order to drill for, remove and dispose of oil and gas deposits lying within said tract. In the Dos Cuadras field, the concern focuses on Platform Hillhouse, which was located on the west side of Tract 401; in the Carpinteria field, attention settles on Platform Henry, which was to be located on the east side of Tract 401.

---

[*] Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed July 15, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

As to Platform Hillhouse, the essence of plaintiffs' claim is that defendant unreasonably delayed plaintiffs in their efforts to install Platform Hillhouse on Tract 401 and to drill for and produce oil and gas from said platform. Plaintiffs aver that this breach of lease contract by defendant was responsible for 189 days of delay and seek to recover attendant damages.[1] Platform Hillhouse was installed on Tract 401 and did produce oil and gas from the Dos Cuadras field. As to Platform Henry, plaintiffs contend that defendant's refusal to approve their application to install Platform Henry on Tract 401 constituted a breach of the lease contract entitling them to resulting damages. Further, plaintiffs maintain that defendant's actions relative to Platform Henry resulted in a taking of their leasehold rights, in whole or in part, entitling them to a just compensation award under the Fifth Amendment to the United States Constitution. Plaintiffs have not as of the date proof was closed in this case produced any oil or gas from the Carpinteria field on Tract 401.

Defendant disclaims any unreasonable delay, interference or improper actions relative to installation of and production of gas and oil from Platform Hillhouse. As to Platform Henry, defendant asserts that the actions of the Secretary of the Interior (hereinafter Secretary) relative thereto were legal, proper and justified. Further, in response to plaintiffs' taking claim, defendant advances the view that, in fact, no taking occurred; and that, in any event, the Secretary had no legal authority to effect a taking, in whole or in part, of plaintiffs' leasehold.[2]

For reasons set forth herein, it is concluded that defendant did not breach the lease contract relative to the installation and operation of Platform Hillhouse. It is my opinion, however, that defendant did breach the lease agreement with respect to denial of plaintiffs' application for installation of Platform Henry. It is also my opinion that, in any event, defendant's actions as to Platform Henry did not constitute a taking, in whole or in part, of plaintiffs' leasehold.

I

A

The OCSL Act came into being in 1953. This Act provided *inter alia*, for federal jurisdiction over submerged lands on the Continental Shelf which were beyond the 3-mile limit from the coastline.[3] *See United States v. California*, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965) and 382 U.S. 448, 86 S.Ct. 607, 15 L.Ed.2d 517 (1966).

Section 8 of the OCSL Act, 43 U.S.C. § 1337(a), authorized the Secretary to grant oil and gas leases on OCSL by competitive bidding. In *Union Oil Company of California v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975), it was stated that:

* * * A lease issued under this Act [OCSL Act], like a mineral lease granted under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq., does not convey title in the land, nor does it convey an unencumbered estate in the oil and gas. *See Boesche v. Udall*, 373 U.S. 472, 478, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); *McKenna v. Wallis*, 344 F.2d 432, 440–41 (5th Cir. 1965), vacated, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). The lease does convey a property interest en-

1. The parties agreed, and a trial judge so ordered, that the issues of liability and damages be severed, with the matter of quantum, if any, reserved for determination subsequent to resolution of the liability issues.

2. The parties elected to present this litigation to the court on a stipulation of facts, accompanied by a large number of documentary exhibits. Neither party wanted a trial. These decisions by the parties were made after each side had engaged in exhaustive pretrial discovery. In retrospect, the absence of testimonial evi-

dence has inhibited, to some degree, the ability of the trier of fact to make more definitive findings in certain areas where the parties proffer different conclusions based on the same stipulated facts. See in this regard *Kramer v. United States*, 406 F.2d 1363, 1367–68, 186 Ct.Cl. 684, 691–93 (1969).

3. The Submerged Lands Act, 67 Stat. 29 (1953), 43 U.S.C. § 1301–15, granted title to the coastal states of submerged lands within the 3-mile limit.

forceable against the Government, of course, but it is an interest lacking many of the attributes of private property. Oil and gas deposits beneath the continental shelf are precious resources belonging to the entire nation. Congress, although encouraging the extraction of these resources by private companies, provided safeguards to insure that their exploitation should inure to the benefit of all. These safeguards are not limited to those provided by covenants in the lease; Congress also authorized the Secretary to maintain extensive, continuing regulation of the oil companies' day to day drilling operations.[4]

Section 5(a)(1) of the OCSL Act, 43 U.S.C. § 1334(a)(1), provided that:

The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. In the enforcement of conservation laws, rules, and regulations the Secretary is authorized to cooperate with the conservation agencies of the adjacent States. Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide for the assignment or relinquishment of leases, for the sale of royalty oil and gas accruing or reserved to the United States at not less than market value, and, in the interest of conservation, for unitization, pooling, drilling agreements, suspension of operations or production, reduction of rentals or royalties, compensatory royalty agreements, subsurface storage of oil or gas in any of said submerged lands, and drilling or other easements necessary for operations or production.

Section 4(f) of the OCSL Act, 43 U.S.C. § 1333(f) provided that:

The authority of the Secretary of the Army [acting through the Army Corps of Engineers] to prevent obstruction to navigation in the navigable waters of the United States is extended to artificial islands and fixed structures located on the Outer Continental Shelf.[5]

Both Interior[6] and the Army Corps of Engineers[7] (Corps) issued regulations implementing the OCSL Act.

---

4. The Ninth Circuit also observed that:

" \* \* \* Careful study of the Act confirms that Congress intended to exercise both proprietary powers of a landowner and the police powers of a legislature in regulating leases of publicly owned resources. *Cf. Forbes v. United States*, 125 F.2d 404, 408 (9th Cir. 1942). The Secretary, to whom Congress has delegated these powers, may prescribe at any time those rules which he finds necessary for the conservation of natural resources. 43 U.S.C. § 1334(a)(1) \* \* \*" (512 F.2d at 747.)

5. The authority of the Secretary of the Army referred to in section 4(f) issues from section 10 of the River and Harbors Act, 33 U.S.C. § 403 (1970). While the language in the OCSL Act does not, *in haec verba*, require the Secretary of the Army to consider matters unrelated to navigation, it has been held that the authorization of 33 U.S.C. § 403 permits the Secretary of the Army to consider ecological factors as well as navigational factors in carrying out his responsibilities in this area. *Zabel v. Tabb*, 430 F.2d 199, 214 (5th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).

6. Interior issued regulations on May 8, 1954, which dealt with the granting of and operations under oil and gas leases on the OCSL (19 Fed. Reg. 2661). These regulations were revised and recodified in 1964 (43 C.F.R. § 3380). The regulations established, *inter alia*, a standard form oil and gas lease. Initially the lease was identified as Form 4–1255, but in February 1966, the lease was modified somewhat and redesignated as Form 3380–1. Other regulations required a lessee to file with an appropriate United States Geological Service (USGS) office a plan of development and an application for a permit to install a platform on a tract relative to lease implementation. (30 C.F.R. § 250.34).

7. Army Corps of Engineers (Corps) regulations were issued on December 18, 1968 (33 Fed.Reg.

The lease (Form 3380–1) binding the plaintiffs and the Bureau of Land Management (BLM), Department of the Interior, provided that the lease was entered into " * * * under, pursuant, and subject to the terms of the Outer Continental Shelf Lands Act of August 7, 1953 * * * and to all lawful and reasonable regulations of the Secretary of the Interior * * * when not inconsistent with any express and specific provisions herein, which are made a part hereof."

Under section 1 of plaintiffs' lease, they, as lessees, were given:

> * * * [T]he exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits * * * [in or under Tract 401]
>
> * * * * * *
>
> (c) the right to construct or erect and to maintain within the leased area [Tract 401] all * * * platforms, fixed or floating structures * * * pipelines * * * and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease * * *.

Section 2(c) of plaintiffs' lease required them:

> * * * Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof * * as the Secretary [of the Interior] may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

### B

The findings of fact deal in great detail with the varied and myriad facts advanced by the parties in this litigation. For present purposes only a brief account of the facts will be set forth in order to place the positions of the parties in proper perspective. Discussion of additional facts will occur when the arguments of the parties are considered.

The Santa Barbara Channel (the Channel) runs in an east-west direction between the coast of Southern California from Point Conception to Port Hueneme and the offshore islands of San Miguel, Santa Rosa, Santa Cruz, and Anacapa. The Channel is about 70 miles long (east-west) and varies from about 10 to 30 miles in width (north-south). The Channel area has a number of oil and gas fields; and natural hydrocarbon seeps, both onshore and offshore, are a widespread phenomenon in the area.

Offshore oil production in the Channel commenced without specific state or federal permission in 1896 by means of wells drilled from piers. Oil production from the Channel has continued since that time. After 1921, pursuant to state policy, California authorized exploration for hydrocarbons in the Channel. This exploration resulted in the discovery of a number of fields which yielded substantial hydrocarbon production. However, in response to protests from residents and officials of the City of Santa Barbara that exploration for and production of oil and gas on state lands in the Channel area bordering the city would be unsightly, the State of California, in 1955, established a "sanctuary area" 16 miles long, from shoreline to the 3-mile limit, wherein no exploration or leasing would be permitted. This sanctuary embraced a coastal area which featured the City of Santa Barbara as its approximate midpoint. Interior was well aware of this sanctuary and attendant history when it set in motion the advertisement which led to the 1968 lease sale.

Sometime in 1965 the United States Geological Service (USGS) became alert to the significance of the fact that the Carpinteria oil and gas field in the Channel extended

---

18,670). These regulations required, *inter alia*, a lessee to obtain a permit from the Corps before any installation could be placed on a tract on the OCSL.

under both state lands and federal lands. California had leased a tract of state land in the Channel for oil and gas production from the Carpinteria field prior to November 1965. USGS believed that if state oil and gas production from the Carpinteria field continued, drainage from the Carpinteria field under federal land would occur thereby depriving the Federal Government and its potential lessees of revenues. Accordingly, Interior solicited bids for lease sale of Tract 298 (OCS–P–0166). This tract was directly east of plaintiffs' Tract 401. Both Tract 298 and Tract 401 were located on portions of the Carpinteria oil and gas field in the Channel. In December 1966, Tract 298 was awarded to a group consisting of the Phillips Petroleum Company, Cities Service Oil Company, and Continental Oil Company (the Phillips Group). Subsequently, the Phillips Group installed two drilling platforms on Tract 298 (known as Platforms Houchin and Hogan) both of which were producing gas and oil from the Carpinteria field by November 1969.

In December 1966, BLM invited, by public notice, oil companies to indicate, without committing themselves, those tracts in the Channel which they might be interested in leasing. A press release described the procedures in this regard. This proposed federal leasing program in the Channel generated protests from various state-county-city (California) and other groups. These groups maintained that a federal leasing program would impinge on the state's sanctuary area and would serve to encourage and/or require the state to lease sanctuary lands to prevent federal drainage of said state lands. Further, these groups argued that additional leases would mean additional drilling platforms which would mar the aesthetics of the ocean view from the shore. The protesting groups met with Interior officials on the matter. Thereafter, Interior decided that a 2-mile strip of federal land seaward of the state sanctuary land would not be leased, except for two tracts—Tract 401, plaintiffs' tract, and Tract 402. Tract 402 was subsequently leased to a group composed of Union Oil Company of California, Mobil Oil Corporation, Gulf Oil

Corporation, and Texaco, Inc. (the Union Oil Group). Tract 402 was situated directly west of plaintiffs' Tract 401. Both Tract 402 and Tract 401 were located on a portion of the Dos Cuadras oil and gas field.

Before embarking on a federal lease program in the Channel, Interior gave consideration to the visual impact (aesthetics) of above-water installations on the Channel lease tracts. Interior also prepared other studies while considering this lease program. In December 1967, Interior offered some 110 parcels of Channel land for general lease sale. A lease sale was held on February 6, 1968, in Los Angeles, California. As a result of this sale, leases were awarded on 71 parcels of land in the Channel for a total payment to the Federal Government of $602,719,261.60.

Plaintiffs were successful bidders at the February lease sale for Tract 401, for which they paid the Federal Government $38,380,-032. A formal lease was executed by Interior and the plaintiffs on April 1, 1968.

### Platform Hillhouse

After plaintiffs acquired the lease to Tract 401, they commenced exploration activities. They confirmed that the oil-bearing sands of the Dos Cuadras field extended under the northwestern portion of Tract 401. As indicated earlier, the Dos Cuadras field also extended under the northeastern portion of Tract 402 which the Union Oil Group leased as a result of the February 1968 sale.

By November 1968 plaintiffs decided to construct a platform, called Hillhouse, on the western portion of Tract 401, from which to drill for and produce oil and gas from the Dos Cuadras oil and gas field. Plaintiffs signed a contract on February 11, 1969, with J. Ray McDermott, Inc. (McDermott) to construct Platform Hillhouse. This contract resulted from negotiations with McDermott by plaintiffs which ostensibly began in November 1968. On May 1, 1969, plaintiffs signed a drilling contract with Island Drilling, Inc.

On January 24, 1969, plaintiffs submitted to the Pacific Regional Supervisor, USGS, a plan for development of the west side of Tract 401, including proposals for the construction and placement of Platform Hillhouse.[8] Because of the Union Oil blow out on January 28, 1969, which will be discussed next, plaintiffs, on February 6, 1969, withdrew the plan of development mentioned above.

The Union Oil Group, Union Oil was the operator for the Group, acquired Tract 402 at the February 6, 1968, sale. As indicated earlier, this Tract was directly east of and adjacent to plaintiffs' Tract 402. Both Union Oil and plaintiffs were to tap the same oil field. On April 18, 1968, Union Oil applied to the Pacific Regional Supervisor, USGS, for permission to erect Platform A on the northeastern portion of Tract 402. Union Oil supplied the Regional Supervisor—the record does not indicate why— with supplemental information on April 29, 1969. The Pacific Regional Supervisor, USGS, granted final approval to Union Oil's application on May 6, 1968. In September 1968 Union Oil erected Platform A on Tract 402. This platform was located 1,350 feet west of the boundary line between Union Oil's Tract 402 and plaintiffs' Tract 401. It was installed to produce oil and gas from the Dos Cuadras field.

By January 26, 1969, Union Oil had completed three wells from Platform A and two additional wells were being drilled. On the morning of January 28, 1969, the fifth well being drilled from Platform A blew out. The blow out caused a massive oil spill in the Channel, killing birds and marine organisms, damaging beaches and seafront properties and restricting fishing and recreational activities in the Santa Barbara coastal area. See Union Oil Company of California v. Morton, supra, 512 F.2d at 746. The seepage of oil, polluting the Channel and adjacent coastline, continued into February 1969. The area from which oil seepage occurred extended from a point approximately 1,300 feet west of Union Oil's Platform A to a point on plaintiffs' Tract 401 approximately 2,600 feet east of Platform A. This blow out set in motion the chain of events which underscore this litigation.

Following the Union Oil blow out, a series of investigations, reviews of existing procedures, and reconsiderations of the federal leasing program in the Channel took place. The atmosphere surrounding these efforts was clouded by clamor from many public and private groups and individuals who were opposed to the federal Channel leasing program. Indeed, bills were introduced in the Congress of the United States to terminate all drilling in the Channel. A federal sanctuary plan under which some 20 Channel leases, later expanded to cover 35 Channel leases, would be revoked and the tracts associated therewith placed in said sanctuary was the subject of bills introduced in the Congress. This plan, however, did not include plaintiffs' Tract 401, Union Oil's Tract 402, or the Phillips Group's Tract 298. None of the legislative efforts spawned by the Union Oil blow out were successful.

As a result of the Union Oil blow out, Interior suspended drilling and production operations on federal leased tracts in the Channel.[9] Initially, Interior took steps directly related to the containment of the oil spill in the Channel area. Thereafter, Interior was concerned about assuring that future operations would not result in a recurrence of a Union Oil type blow out.

On March 3, 1969, Interior allowed drilling and production from the Carpinteria field on the Phillips Group's Tract 298 to resume on a temporary basis. This authorization was made permanent on April 1, 1969.

---

8. The pertinent regulations (30 C.F.R. § 250.34 (1964)) required that a plan of development be submitted for approval after an oil and gas discovery has been made on a leased tract. The regulations also provided that any plan approved by the Regional Supervisor "may be modified from time to time as conditions may warrant." Procedures governing the submission of a plan of development were set out in 30 C.F.R. § 250.34(b) (1964).

9. This suspension did not apply when it was necessary to drill on the Union Oil blow out well in order to relieve damaging pressure.

Of the investigations conducted as a result of the Union Oil blow out, the most prestigious was that conducted by the Du-Bridge Committee.[10] The DuBridge Committee announced its report and recommendations on June 2, 1969, and suggested an order of priorities be established relative to Channel activity on federal-leased lands. The first priority recommended by the Committee was to control the oil seepage. The sixth, and final, priority recommended by the Committee was to deplete all Dos Cuadras Repetto reservoirs as efficiently and rapidly as possible consistent with safety.

On June 9, 1969, Interior authorized Union Oil to drill nine wells from Platforms A and B. These nine wells were drilled, completed, and, with the exception of one well on which drilling was suspended by Union Oil itself, put into production during the months of June and July 1969, without incident.

On April 18, 1969, plaintiffs submitted a revised plan of development of the west side of Tract 401. This revised plan was received by the Pacific Regional Office, USGS, on April 25, 1969. The revised plan was not inconsistent with any applicable rule, regulation or order of Interior. Plaintiffs' revised plan located Platform Hillhouse some 1,400 feet east of the boundary line of Union Oil's Tract 402 and approximately 2,750 feet east of Union Oil's Platform A.

On April 24, 1969, plaintiffs submitted an application to USGS requesting approval to install and maintain Platform Hillhouse on its Tract 401. This application was in accordance with the procedure required by 30 C.F.R. § 250.34(a) (1964).

On April 30, 1969, plaintiffs applied to the Corps for a permit to install Platform Hillhouse in the Channel on Tract 401.[11] This application was in full compliance with all applicable rules, regulations and orders of the Corps. Because their respective responsibilities overlapped to some degree, Interior and the Corps agreed that they would coordinate their OCSL actions, ostensibly to avoid duplication and inconsistent orders. It was agreed that the Corps would consider navigation and national security when acting on installation permits and Interior would cover all "general public interest matters" when authorizing development activity in the Channel. As implemented, the Corps processed installation permit applications after Interior had cleared tracts for lease development.

Plaintiffs' plan of development and their application to install Platform Hillhouse were under consideration by Interior from April 25, 1969, until August 15, 1969, when both were approved by the Secretary of Interior, Walter J. Hickel.

On August 25, 1969, the Corps began to process plaintiffs' Platform Hillhouse installation permit. This process [12] involved public hearings and generated public comment and input. It resulted in unsuccessful legal actions seeking restraining orders and injunctions barring granting of the installation permits.[13] The Corps issued the permits to plaintiffs on November 7, 1969.

---

**10.** President Nixon appointed his science advisor, Dr. Lee DuBridge, to form an investigating committee to determine the proper course of action to be followed relative to continued Channel drilling and production from the Dos Cuadras oil and gas field. On April 7, 1969, President Nixon requested Dr. DuBridge to assemble another committee to make recommendations about future steps that should be taken regarding drilling and production on Union Oil Tract 402.

**11.** On May 7, 1969, plaintiffs made application to the Corps for a permit to install a submarine power cable from shore to Platform Hillhouse.

**12.** On September 9, 1969, plaintiffs applied to the Corps for a permit to install an oil, gas and water pipeline bundle between Platform Hillhouse and Union Oil's Platform A. Both permits were processed by the Corps.

**13.** The final decision by the District Court was rendered on November 3, 1969. The Ninth Circuit Court of Appeals upheld the action of the District Court on November 17, 1969, and the Supreme Court of the United States declined to hear the matter on November 25, 1969, *County of Santa Barbara v. Malley*, 396 U.S. 950, 90 S.Ct. 394, 24 L.Ed.2d 257 (9th Cir. 1969).

Construction of Platform Hillhouse started on January 14, 1969, at the Kaiser Steel Company yards in Oakland, California. The platform was originally scheduled for completion on June 15, 1969. However, this schedule was revised on February 27, 1969, at which time it was estimated that the earliest date for completion of the platform was July 30, 1969.

On April 21, 1969, plaintiffs met with McDermott, the platform contractor and Kaiser Steel. A revised platform delivery date of August 11, 1969, was established. At this meeting, the impact of the January 28, 1969, Union Oil blow out was discussed. The minutes of this meeting provided in pertinent part:

1. Since Union's leak is still very much in evidence, Sun's application to develop Tract 401 has met with unforeseen delays.

2. Sun is extremely confident that the USGS will approve our development plan, and the Corps of Engineers will permit the platform.

3. Secretary Hickel could veto a USGS recommended approval of our plan and cancel the lease, but this seems very unlikely.

4. A formal presentation to the USGS of our development plan is to be made April 25, 1969. An application to install Platform Hillhouse will be submitted at this time. We do not expect an answer from the USGS until about May 16.

5. Sun is trying to coordinate the installation of the platform with construction of onshore producing facilities. It will be necessary to have these facilities operational before drilling will be permitted.

At this meeting, the participants also discussed the possibility of future platform delivery delay. Kaiser personnel recommended that, in any event, platform construction be completed without any delay or shut down, since "[s]hut down and resumption of work could be most costly." According to Kaiser, the platform components could be stored until delivery was possible, and that by good planning storage costs could be held to a minimum.

Between April 21, 1969, and June 17, 1969, construction work on Platform Hillhouse continued. On June 17, 1969, plaintiffs advised McDermott that they would be unable to accept delivery of the platform in accordance with the revised schedule established on April 21, 1969. Thereafter, work on the platform components slowed down and, on July 18, 1969, all construction work on the platform ceased completely.[14] After Interior's approval of their permits on August 15, 1969, plaintiffs authorized McDermott to instruct Kaiser to resume construction work on the platform without delay. Construction work on the platform began again on September 2, 1969. On October 30, 1969, plaintiffs were advised that platform construction would be completed on November 10, 1969.

On this record it is reasonable to assume that if construction work on the platform had not been suspended, the platform would have been available at the earliest on August 11, 1969. This was only 4 days before Secretary Hickel granted plaintiffs' applications. However, on reading the minutes of the April 21, 1969, meeting, discussed above, it would not be unreasonable to assume a delivery date after August 15, 1969.

Installation of Platform Hillhouse on Tract 401 began on November 21, 1969, and required some 65 days. Plaintiffs took possession of the platform on January 21, 1970.

In order to prepare for oil and gas production, plaintiffs engaged in efforts to secure onshore facilities, a platform power supply, and a pipeline access from onshore to the offshore platform. These efforts, to

---

14. While not clear in the record, it seems reasonable to infer that plaintiffs directed McDermott and/or Kaiser to suspend construction work on the platform. As indicated above, Kaiser recommended against any interruption or delay in the construction of the platform regardless of any future extension of the estimated delivery date then contemplated by the April 21 conferees.

one degree or another, served to delay plaintiffs' drilling preparations.

Plaintiffs were ready to drill their first well from Platform Hillhouse on April 6, 1970. On May 18, 1970, plaintiffs received authorization from the Pacific Regional Supervisor to drill without the availability of pipeline facilities to shore. On May 20, 1970, the District Engineer advised plaintiffs that Platform Hillhouse, its rigs and its equipment had been successfully inspected and that plaintiffs had approval to commence drilling operations. On May 25, 1970, plaintiffs commenced drilling on the first well from Platform Hillhouse. On June 16, 1970, plaintiffs' first well was completed and ready to produce.

On May 25, 1970, however, plaintiffs did not have available to them pipeline facilities for transmitting the oil and gas from platform to shore. On July 21, 1970, plaintiffs were able to resolve the shore to platform pipeline facility problem. On and after July 21, 1970, plaintiffs obtained oil and gas production from Platform Hillhouse. This completed development of the west side of Tract 401 on which the Dos Cuadras oil and gas field was located.

### Platform Henry

As indicated earlier, the east side of Tract 401 embraced the Carpinteria oil and gas field. The Phillips Group had been draining this field under a federal lease since June 10, 1968. Unitization of plaintiffs' Tract 401 with the Phillips Group's Tract 298 was not technically feasible in order to develop fully the Carpinteria field because the Phillips Group's Platform Houchin could not obtain maximum ultimate recovery from this field. Unitization was a cooperative procedure whereby two or more lessees would unite in drilling and production endeavors. Accordingly, it was necessary for plaintiffs to install their own platform in order to develop the east side of Tract 401.

On December 29, 1969, plaintiffs submitted their plan of development for the east side of Tract 401. On January 22, 1970, plaintiffs applied for a permit to install Platform Henry on the east side of Tract 401. Both submissions were sent to the Los Angeles Regional Office USGS, and the permit transmittal letter requested rapid approval because delays would result in drainage of the oil and gas in the field by the Phillips Group's operations on Tract 298. As submitted, plaintiffs' east side plan of development and application for a permit to install Platform Henry were not inconsistent with any rule, regulation, or order of Interior.

By February 3, 1970, the Santa Barbara District Engineer and the Pacific Regional Supervisor, USGS, had recommended approval of plaintiffs' plan application and Platform Henry's permit. These recommendations were forwarded to the Washington office of USGS on or about February 3, 1970.

Public hearings on Platform Henry were held on January 14, 1971, in Santa Barbara, California. Shortly thereafter, Interior began to prepare a draft of an Environmental Statement on the proposed installations of Platform Henry [15] in accordance with the procedures of the National Environmental Policy Act of 1969, 83 Stat. 852, 42 U.S.C. § 4331 (1970). The availability of the initial draft of the Environmental Statement was announced on May 11, 1971, and public comment was invited and received.

On August 23, 1971, a copy of the Final Environmental Statement was submitted to the Secretary, together with a recommendation from the Assistant Secretary of the Interior for Mineral Resources, that plaintiffs' application and permit be granted. No official of the Interior recommended to the Secretary that plaintiffs' application and permit for Platform Henry be denied on environmental or any other ground.

On September 20, 1971, Secretary of Interior, Rogers C. B. Morton, denied plaintiffs' permit to install Platform Henry "because

---

**15.** The Statement also involved consideration of Union Oil's application and permit to install

Platform C on its lease Tract 402 in order to drill into the Dos Cuadras oil and gas field.

of overriding environmental conditions." [16] On November 3, 1972, more than a year after denial of plaintiffs' permit application, and after commencement of this litigation, Secretary Morton issued a "Statement of Decision", wherein he listed some six grounds in support of his denial of the Platform Henry permit request. Secretary Morton had not spelled out these grounds in his decision of September 20, 1971, denying the permit application.

On September 29, 1975, plaintiffs submitted to the Los Angeles Regional Office, USGS, a plan of development for the east side of Tract 401, a request for a permit to install Platform Henry, and a request for approval to drill exploratory wells. On April 28, 1976, USGS, advised plaintiffs it could not approve the plan of development as submitted. It further advised plaintiffs that it could not approve drilling and platform installation requests together, but could approve, if separately submitted, drilling plans.

On July 9, 1976 plaintiffs submitted to USGS a plan to drill an exploratory well (well No. 9) on the east side of Tract 401. In early August 1976, plaintiffs submitted an Oil Spill Contingency Plan to USGS. On August 23, 1976, plaintiffs applied for a permit to drill well No. 9 into the Carpinteria field. USGS issued such a permit to plaintiffs on September 9, 1976. On plaintiffs' application, USGS issued a permit allowing plaintiffs to drill well No. 10 on the east side of Tract 401 on December 29, 1976. The drilling of well No. 10 was completed in January 1977.

The actions of the parties in 1975–1977, as related above, clearly indicate that they viewed the lease agreement between them as existing, valid, operative and enforceable. As of the date of final closing of proof in this case (February 3, 1977), no plan of development or application for a permit to install Platform Henry on the east side of Tract 401 had been approved by USGS.

---

16. Union Oil's application and permit for Platform C were likewise denied at the same time. Union Oil challenged this denial in *Union Oil*

II

Plaintiffs' breach of lease contentions relative to Platforms Hillhouse and Henry are premised on the general proposition that:

\* \* \* neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance \* \* \*.

*Wah Chang Corp. v. United States*, 282 F.2d 728, 733, 151 Ct.Cl. 41, 49 (1960); *see also* 5 Williston, Contracts § 670 at 159 (3d ed. 1961).

Specifically, as to Platform Hillhouse, plaintiffs claim that defendant unreasonably delayed them in their efforts to install said platform on the west side of Tract 401 and to produce oil and gas therefrom. *See George A. Fuller Co. v. United States*, 69 F.Supp. 409, 108 Ct.Cl. 70, 94–102 (1947); *see also Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26, 30, 32, 213 Ct.Cl. 192, 200–01, 203–05 (1977). With respect to Platform Henry, plaintiffs challenge defendant's denial to them of permission to install said platform on the east side of Tract 401 as unjustified. *See Neely v. United States*, 285 F.2d 438, 442, 152 Ct.Cl. 137, 145 (1961).

The disputes between the parties center on whether the established facts fit the mold of case law which requires that defendant respond by way of breach of contract damages if it unreasonably delays a lessee in contract performance or if it unjustifiably prevents a lessee from performing under its contract.

It is important, when considering the contentions of the parties, to bear in mind that the lease contract between the parties was entered into:

Under, pursuant and subject to the terms and provisions of the \* \* \* [OCSL Act], and to all lawful and reasonable regulations of the Secretary of the Interior \* \* \* when not inconsistent with

*Company of California v. Morton*, 512 F.2d 743 (9th Cir. 1975).

any express and specific provisions herein, which are made a part hereof * *.

The circumstances relative to issuance of the lease in question, the milieu in which lease performance was to take place, and the environmental concerns implicit in the totality of the federal leasing program on OCSL cannot be overlooked in the consideration of the present claims. The actions of the Secretary, herein challenged, must be viewed in the light of the obligations, duties and responsibilities placed on him by the OCSL Act, the very Act which gave birth to the lease now in issue. Plaintiffs' lease rights are not absolute and unqualified under the circumstances. However, the Secretary's power and authority to obliterate and/or interfere with vested lease rights is not absolute. The Secretary would have to respond in damages for unbridled, unjustified and unreasonable interference with plaintiffs' lease rights.[17] See Union Oil Company of California v. Morton, supra.

The crucial factual determinations to be reached herein are whether the actions of the Secretary and the actions of the Corps, were unreasonable and unjustified under the circumstances in which they were taken. Since a determination of whether defendant's actions regarding Platform Hillhouse constituted a breach of lease brings into consideration factors that are not involved in the determination of whether defendant's actions with respect to Platform Henry constituted a breach of lease, the following discussion will deal separately with the claims associated with these platforms.

### Platform Hillhouse

Plaintiffs put forth three separate delay claims covering the period April 25, 1969—July 21, 1970, aggregating some 189 days of delay. April 25, 1969, was the date when plaintiffs' revised plan of development and permit for installation of Platform Hillhouse was received by USGS for approval. July 21, 1970, was the date when plaintiffs began producing oil and gas from Platform Hillhouse.

First, plaintiffs maintain that the period from August 11, 1969, when the platform was scheduled to be completed, to November 10, 1969, when the platform was actually completed (91 days), constitutes a period of unreasonable delay occasioned solely by the failure of Interior to promptly process, approve and issue the application and permit necessary for the construction and installation of Platform Hillhouse. Plaintiffs further maintain that the unreasonable delay of the Corps in processing their navigation permit required plaintiffs to install the platform in the winter season. Plaintiffs allege that during this winter season they were delayed 21 days by adverse weather conditions which would not have been encountered if the Corps had approved this permit more promptly. Accordingly, plaintiffs seek delay damages for 112 days resulting from events which occurred, or failed to occur, during the period April 25, 1969—January 21, 1970. January 21, 1970, was the date when Platform Hillhouse was installed on Tract 401.

Second, plaintiffs seek to recover delay damages for the period from April 6, 1970, when plaintiffs were ready to drill their first well from Platform Hillhouse, to May 18, 1970, when USGS granted approval to plaintiffs to commence drilling. Plaintiffs claim 42 days of delay.

Third, and finally, plaintiffs seek to recover delay damages for the period from June 16, 1970, when plaintiffs' first well on Platform Hillhouse was completed and ready to produce, to July 21, 1970, when plaintiffs began producing oil and gas from said platform. Plaintiffs claim 35 days of delay.

### a. The first delay claim period

Upon receipt of plaintiffs' plan of development and request for an installation per-

---

17. This is also true with respect to actions on the part of the Corps relative to its role in OCSL activities pertaining to Platform Hillhouse.

mit on April 25, 1969, Interior began the process of review attendant thereto.[18]

On May 5, 1969, the Santa Barbara District Engineer, USGS recommended to the Pacific Regional Supervisor, USGS, that plaintiffs' plan of development and application to install Platform Hillhouse be approved. The Pacific Regional Supervisor, in turn, recommended approval of plaintiffs' plan and permit application on May 16, 1969, together with a request that a geologic clearance be processed without too much delay.[19] On June 3, 1969, the Acting Oil and Gas Supervisor, Pacific Region, USGS, and the Regional Geologist, USGS, recommended approval of plaintiffs' plan and permit application. The matter was then forwarded to the Washington office of USGS where, on June 30, 1969, the Director, USGS, recommended to the Secretary of the Interior, Walter J. Hickel, that both plaintiffs' plan of development and installation permit be approved.

As indicated earlier, the DuBridge Committee issued its report on June 2, 1969. One of its recommendations was that the Dos Cuadras Repetto reservoirs be drained as efficiently and rapidly as possible consistent with safety. Such draining would serve to relieve pressure in these reservoirs.

On June 9, 1969, Interior authorized Union Oil to drill nine wells from Platforms A and B in order to drain said reservoirs. Eight of these wells were drilled and put into production during the months of June and July 1969 without incident. This activity by Union Oil undoubtedly supplied Interior with needed information although the record is most skimpy in this area. In any event, Interior requested plaintiffs to conduct a surface survey on their tract for bubbles.[20] Plaintiffs did so on August 4, 1969, and reported the absence of any bubbles. During the second week of August 1969, plaintiffs were requested by Interior to further revise their plan of development. After meeting with Secretary Hickel on August 11, 1969, plaintiffs revised their plan of development. They submitted their revised plan of development to Interior on August 15, 1969, and approval was given that same day.

Plaintiffs argue that this approval by Interior on August 15, 1969, of submissions received by Interior on April 25, 1969, was unreasonably long in duration. Plaintiffs suggest that approval should have been finalized when the Regional Supervisor recommended approval on May 16, 1969,[21]

---

18. The authority of Interior to approve plans of development and to regulate issuance of installation permits relative to OCSL leases is not challenged. The crux of plaintiffs' claim is that Interior took an unreasonably long period of time in effectuating the review process.

19. At the time the lease was entered into, the Regional Supervisor had been authorized to act as representative of the Secretary of the Interior relative to lease activities on the OCSL (30 C.F.R. § 250.2(c)(1966)). Prior to the Union Oil blow out, the Regional Supervisor was authorized, inter alia, to approve a plan of development and to issue an installation permit (30 C.F.R. §§ 250.11 and 250.34 (1966)). After the blow out, Secretary Hickel withdrew the Regional Supervisor's approval authority and required his personal approval of any plan of development and installation permit under OCSL leases. Under the circumstances, this action by Secretary Hickel is considered authorized, proper and reasonable. The Secretary's action in this regard was not published in the Federal Register. Plaintiffs' briefs do not advance any legal argument relative to this lack of publication. In any event, while not crystal clear, the record does suggest that plaintiffs

were aware, at all material times, that the Secretary and not the Regional Supervisor, would have to approve their plan of development and installation permit (see text at p. 799, supra). See Timber Access Industries Co. v. United States, 553 F.2d 1250, 1254–55, 213 Ct.Cl. 648, 656–57 (1977). Miller v. United States, 531 F.2d 510, 515, 209 Ct.Cl. 135, 144 (1976).

20. It is important to note that the area from which oil seeped as a result of the January 28, 1969, blow out was just some 150 feet from where Platform Hillhouse was to be installed. Presumably, the presence of surface bubbles would indicate that drilling on the Repetto reservoirs was not safe.

21. Plaintiffs argue further that their plan and installation permit approval should have been granted at the very latest on June 17, 1969. Plaintiffs select this date because it is the date on which the plaintiffs instructed their contractor to suspend construction work on the platform. If the sought-for approval had been received on or before June 17, 1969, plaintiffs undoubtedly would not have suspended platform construction work.

pointing out that the Regional Supervisor had such final approval authority at the time the lease was entered into. However, this was before the Union Oil blow out.[22] Such an argument has little surface appeal under the circumstances existing after the blow out. The blow out was a devastating event and required careful, prudent and cautious actions by Interior to control the oil spill first, and, second, to assure that such a blow out did not occur again. It is in this climate that the actions of Interior in processing plaintiffs' application for plan and installation permit approval must be examined.

■ It has been held that "[w]hat is a reasonable period of time for the government to do a particular act under the contract is entirely dependent upon the circumstances of the particular case." *Tri-Cor, Inc. v. United States,* 458 F.2d 112, 131, 198 Ct.Cl. 187, 221 (1972). Plaintiffs can prevail on their delay claims only if they can establish that any such delay was unreasonable under the existing circumstances. Moreover, plaintiffs must also show that defendant's approval delay was the primary cause of the delay in the installation of Platform Hillhouse. *See L. L. Hall Constr. Co. v. United States,* 379 F.2d 559, 563, 177 Ct.Cl. 870, 878 (1966). This is so because it would be of no avail to plaintiffs if the plan and permit application had been approved but construction of the platform not completed. In this situation, installation could not take place and plan and permit application approval lose significance.

■ When plaintiffs' plan of development and installation permit requests were received by USGS on April 25, 1969, the effects of the Union Oil blow out in the Santa Barbara Channel were still being felt. This blow out, as indicated before, involved severe and extensive environmental damage to the Channel and coastal area. Under the OCSL Act, 43 U.S.C. § 1334(a)(1) (1970), the Secretary was responsible for the administration of OCSL leases and was under a duty to protect the environment against waste and to conserve natural resources. *See Gulf Oil Corp. v. Morton,* 493 F.2d 141 (9th Cir. 1973).[23] Accordingly, it was not only reasonable, but also the legal obligation of the Secretary to employ procedures different from those followed prior to the blow out to assure that such disasters would not occur.[24]

■ Following the blow out, plaintiffs' plan of development and installation permit were subjected to review and study at various levels of USGS. This USGS review and study consumed some 68 days (April 25, 1969—June 30, 1969). Under the circumstances of the blow out and the technical, scientific and environmental matters involved, 68 days is not considered unreasonable, *per se.* This multilevel USGS review process provided a reasonable means to ensure greater protection against the risk of future environmental harm.[25] Its purpose was to make sure that installation of Platform Hillhouse would not have an adverse impact on the Channel environment. On this record, there is no evidence that USGS

**22.** In support of the May 16, 1969, date, plaintiffs note that Union Oil received approval to install Platform A within 3 weeks of its application for plan and installation permit approval. The blow out and its aftermath, however, serve to deprive this comparison of any merit.

**23.** The environmental responsibilities and duties imposed by Congress cannot be lightly assumed by the Secretary. *See Sierra Club v. Department of the Interior,* 398 F.Supp. 284 (N.D.Cal.1975), *modified,* D.C., 424 F.Supp. 172 (1976). (Redwood National Park Act, 16 U.S.C. § 79a–j.)

**24.** While Union Oil's plan of development and permit applications were approved 3 weeks af-

ter they were submitted, which was before the blow out, some 4 months were spent in review and study of Union Oil's operations (February 7, 1969—June 9, 1969) before Union Oil was permitted to resume production after the blow out. The point, which plaintiffs seem to lose sight of, is that the blow out gave rise to a "whole new ball game."

**25.** It should be noted that each level of review and study produced a recommendation which, in turn, was forwarded to the next level of review for consideration. Such a procedure requires reasonable time. *See Scott v. United States,* 44 Ct.Cl. 524, 531 (1909).

personnel were dilatory in performing their review and study duties relative to processing plaintiffs' plan and permit submissions. Moreover, there is a presumption that public officials perform their duties in a proper manner. *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *Librach v. United States,* 147 Ct.Cl. 605, 612 (1959). That presumption stands unrebutted on this record. Under the circumstances, the period from April 25, 1969, to June 30, 1969, cannot be considered to be an unreasonable period for purposes of USGS review, study and recommendations relative to plaintiffs' plan and permit applications.[26]

▮ USGS forwarded plaintiffs' plan and permit applications, with favorable recommendations, on June 30, 1969, to Secretary Hickel. As indicated earlier, Union Oil had been permitted to drill some eight wells in the area during the period June—July 1969.[27] These wells were completed without incident thereby generating a feeling that future drilling and oil production from the Dos Cuadras field could be accomplished in safety. It was reasonable for the Secretary to await the completion of Union Oil drilling in the Dos Cuadras field since this was the very same field on which Platform Hillhouse was to be installed. After Union Oil's success in drilling into the Dos Cuadras field, a bubble test, performed by plaintiffs at defendant's request, indicated that no oil or gas was seeping through fractures or fissures in the Dos Cuadras field. This was a confirmation that additional drilling by plaintiffs could be done safely. Thereafter, Secretary Hickel, after plaintiffs revised their plan as requested, approved said plan on August 15, 1969. The factual recitation above does not establish any unreasonable delay or actions on defendant's part. Instead, the actions reflect a prudent and cautious effort to protect the Channel environment from any risk of harm. On this record, the unrebutted presumption is that the Secretary performed his duties in a proper and responsible manner. *See United States v. Chemical Foundation, Inc., supra; Librach v. United States, supra.*

▮ On this record, and under the circumstances recited above, it must be concluded that defendant was not responsible for any unreasonable delay in the processing, review and approval of plaintiffs' plan of development and installation permit request. The unique situation generated by the extraordinary Union Oil blow out and

---

**26.** The cases cited by plaintiffs espouse the general rule that unreasonable delay engendered by defendant gives rise to delay damages. However, the factual predicates in each of those cited cases make them inapposite. For example, in *United States Casualty Co. v. United States,* 67 F.Supp. 950, 954, 107 Ct.Cl. 46, 67 (1946), it was held that a 4-day delay in defendant's review and approval of certain plans was unreasonable "[s]ince this was a routine matter." In the instant case, review of plaintiffs' plans in the climate of blow out fever was far from a routine matter. It embraced technical, scientific and environmental complexities of a high order. Further, in *Law v. United States,* 195 Ct.Cl. 370, 397 (1971), the court found defendant's delay in approving shop drawings unreasonable in that the defendant had undoubtedly spent a good deal of time on the design of the foundations, even prior to the bid invitations, to which the shop drawings were addressed and thus defendant was familiar with the substance of these shop drawings. Moreover, the court did not look kindly on defendant utilizing approval of the shop drawings as a means to effect important design changes thereby engendering delay. The circumstances of this case, on the other hand, reveal that defendant was not previously aware of the various attributes of Platform Hillhouse until said plans were submitted, and received them in the context of unfamiliar and extraordinary circumstances. Moreover, whether or not installation of such a platform in the Channel was environmentally and technically feasible was a matter that required considerable review and study, especially in view of the recent blow out in the installation area.

**27.** It should be noted that Union Oil was prevented from production drilling from February 7, 1969—June 9, 1969. During this 4-month period, various investigations, studies and reviews were conducted as to whether further drilling in the Dos Cuadras field was possible. It was not until the DuBridge Committee report was issued on June 2, 1969, that continued drilling in this field was cautiously recommended. This 4-month period does serve to indicate that consideration of this complex and highly important environmental situation required time and detailed study.

resulting oil spill dictated that defendant proceed with deliberate prudence and caution in approving the installation of another drilling platform in the very area which produced the disaster. It was reasonable for defendant to so proceed.

At the time plaintiffs' plan and permit request were approved on August 15, 1969, Platform Hillhouse had not been constructed. Accordingly, plaintiffs were not in a position to begin development of Tract 401 until their platform had been constructed and installed. Without more, this absence of a constructed platform renders any delay in plan and permit approval of little or no significance since such a delay would not delay the ultimate completion of the project. *See Law v. United States,* 195 Ct.Cl. 370, 385 (1971). However, plaintiffs respond that they directed their platform contractor to suspend work on the platform on June 17, 1969, precisely because they had not received plan or permit approval and had no idea when such approval would be forthcoming. The question to be answered here is whether plaintiffs were reasonable in directing their platform contractor to suspend work on the platform.[28]

Plaintiffs maintain that it would have been unreasonable for them to continue platform construction in the light of the uncertainty as to when, if ever, their plan and permit submissions would be approved. However, the facts of record indicate that plaintiffs were unreasonable in this regard. ■ Indeed, plaintiffs were not motivated by approval considerations when they authorized construction work on the platform to begin on January 14, 1969, before they even submitted their first plan of development and installation permit request.[29] It is obvious that platform construction was not dependent on plan and/or permit ap-

proval. No provision of the lease agreement or relevant regulations covering lease operations required prior approval of Interior before constructing a platform, nor can the suspension of construction work on the platform be viewed as an effort to minimize damages should defendant fail to give approval. Under the lease plaintiffs had a vested right to install a platform. *See Union Oil Company of California v. United States, supra,* 512 F.2d at 750. Had defendant refused to grant this approval, plaintiffs would have been entitled to breach of contract damages, which would include incurred reasonable platform construction costs. See the discussion, *infra,* as to Platform Henry.

■ Two other important facts bear on the reasonableness of plaintiffs' suspension of platform construction work. First, defendant did not order or direct plaintiffs to suspend and halt platform construction work. It was a unilateral act on plaintiffs' part, taken without consultation with and without a word to defendant. It was a business judgment exercised by plaintiffs. Second, and most important, the suspension and final work halt was taken against the recommendation of the platform contractor. The possibility of installation delay was given consideration by plaintiffs and their contractor in April 1969. The platform contractor advised plaintiffs that it would be less costly to furnish the platform and then store it while awaiting permission to install it, rather than suspend production thereof. Why the plaintiffs elected to ignore this advise is not revealed in the record. The record suggests, and of course is reinforced by but not influenced by hindsight, that plaintiffs did not act reasonably under the circumstances in suspending platform construction work on June 17, 1969. Had

---

**28.** Plaintiffs, in April 1969, anticipated completing the platform for installation purposes around August 11, 1969. In retrospect, had plaintiffs not suspended work on the platform and it was ready on or about mid-August 1969, there obviously would be no valid plan and permit approval delay contention advanced herein.

**29.** Plaintiffs submitted their first plan of development and installation permit request on January 24, 1969. Following the blow out on January 28, 1969, plaintiffs withdrew their first submissions on February 6, 1969. On April 18, 1969, plaintiffs submitted a revised plan and a permit request. Interestingly, plaintiffs never suspended construction work on the platform during this period.

plaintiffs allowed platform construction work to continue, installation thereof would have blended rather nicely with the plan and permit approval given by defendant on August 15, 1969.

Plaintiffs also proffer several other contentions which they allege manifest unreasonable actions by defendant. However, these contentions are subsumed by the determinations reached above that defendant did not unreasonably delay approval of plaintiffs' plan and permit applications, and, in any event, plaintiffs' actions in suspending construction work on the platform was the primary cause of the platform being completed on November 10, 1969, instead of mid-August 1969.

For example, plaintiffs complain that defendant was unreasonable in not immediately implementing the DuBridge Committee Report recommendation that the Dos Cuadras Repetto reservoirs be depleted as efficiently and rapidly as possible consistent with safety. That report was issued on June 2, 1969. Defendant authorized Union Oil, on June 9, 1969, to drill wells from Platform A, which was already installed on its tract, in implementation of the DuBridge Committee recommendation. There was no unreasonable delay or action present. Since plaintiffs' platform had not been constructed, or installed, plaintiffs were in no position to drill wells.

Plaintiffs also argue that the Corps unreasonably delayed issuance to them of a permit to install Platform Hillhouse in the Channel. Plaintiffs' reason that if the Corps had issued the permit more promptly, no later than August 15, 1969, they would not have had to install the platform during the winter season. Since the platform was installed during the winter season, some 21 working days were lost because of adverse weather conditions. Plaintiffs attribute these 21 days of delay to the Corps.

Plaintiffs applied to the Corps for an installation permit on April 30, 1969. It is conceded that the Corps had the authority to require and issue such a permit before the platform could be installed in the Channel. Because of overlapping responsibilities, the Corps and Interior reached agreement that the Corps would be primarily responsible for navigation and national security aspects of permit authorization and Interior would be primarily responsible for environmental and other matters.[30] As a result, it was agreed that the Corps would not process any installation permits until Interior had cleared a platform for installation. Under the circumstances, the action of the Corps in not immediately processing plaintiffs' permit request was not unreasonable. Again, the blow out and its aftermath must be borne in mind. Accordingly, the Corps did not process plaintiffs' permit request, as well as other lessee permit requests, until advised by Interior of its clearance of Tract 401 for platform installation.

After Interior approved plaintiffs' plan and installation permit application on August 15, 1969, the Corps began to process plaintiffs' permit from a navigational and national security point of view. The public notice associated with this process generated public hearings and law suits. As a result, the Corps was finally able to issue the permit to plaintiffs on November 7, 1969. While this date was approximately 6 months after plaintiffs had submitted their permit request, and nearly 3 months after Interior had cleared plaintiffs' plan and authorized installation of Platform Hillhouse, it came 3 days before construction work on Platform Hillhouse was scheduled to be completed.[31] Since the Corps issued the installation permit to plaintiffs before Platform Hillhouse was completed and ready for installation, the permit processing ac-

---

30. Such agreements are not unusual in these circumstances and they have been viewed favorably by the courts and the Congress. *See Zabel v. Tabb, supra* note 5, at 210–11. These agreements avoid duplication of effort and avoid uncertainty as to clearance responsibility and duty. While such cooperative endeavors were not required by the OCSL Act, *supra,* they were not proscribed by that Act.

31. The component parts of Platform Hillhouse were barged to Tract 401 and installation of the platform began on November 21, 1969, and was completed on January 21, 1970.

tions of the Corps resulted in no delay in the installation of Platform Hillhouse. *See Law v. United States, supra,* 195 Ct.Cl. at 385.

Plaintiffs' claim for delay damages covering actions and/or inactions of Interior and the Corps during the period April 25, 1969—January 21, 1970, aggregating 112 days, is not supported by the record in this case.

b. *The second delay claim period*

Plaintiffs were ready to drill their first well from Platform Hillhouse on April 6, 1970. However, USGS did not grant plaintiffs' approval to commence drilling until May 18, 1970. Plaintiffs seek delay damages for this 42-day period on the ground defendant's refusal to approve their drilling request on April 6, 1970, was unreasonable. On this record it is concluded that defendant's actions in this regard were reasonable under the circumstances.

USGS refused to authorize plaintiffs to commence drilling on April 6, 1970, because plaintiffs did not have available pipeline facilities from well head to shore through which oil production could flow. Plaintiffs are correct in pointing out that neither the OCSL Act nor implementing regulations precluded drilling unless pipeline access to shore was available. Plaintiffs argue from this fact that Interior thereby exceeded its authority in requiring such pipeline access as a precondition to drilling.

As indicated earlier, the Secretary was under a duty and had a responsibility to protect the Channel environment during the course of the Federal lease program in the Channel. *See Gulf Oil Corp. v. Morton, supra.* Accordingly, in evaluating actions

taken by the Secretary relative to Channel lease operations this duty and responsibility must be kept in mind.

■ In the plan of development which plaintiffs submitted for approval, plaintiffs advised that they would not commence any drilling until a pipeline to shore was available in order to relieve any unexpected pressure they might encounter while drilling. Indeed, in their April 21, 1969, meeting with their platform contractor, plaintiffs advised it would be necessary to have onshore producing facilities operational before drilling will be permitted. The Secretary approved this plan of development which made the availability of pipeline facilities a precondition to drilling. Under the circumstances, it was not unreasonable for the Secretary to require plaintiffs to abide by their own plan. *See Austin Co. v. United States,* 314 F.2d 518, 520–21, 161 Ct.Cl. 76, 81, *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963).[32] After all, plaintiffs' plan of development had been given careful consideration and found environmentally and technically safe. It would not be prudent to abandon part of that plan without further careful consideration. There was a safety feature associated with the pipeline precondition which Interior obviously could not ignore. If drilling produced a surge of oil for which no pipeline outlet was available, the pent-up pressure might result in further oil spills or seepage from below surface fractures and fissures. Plaintiffs recognized this possibility in their plan of development.

Plaintiffs during this period sought to obtain pipeline to shore facilities. Defendant worked with plaintiffs in this regard.[33]

**32.** The record is clear that pipeline facilities were not available on April 6, 1970. Indeed, such facilities were not available until July 21, 1970. Whether onshore facilities would, in fact, have been available to plaintiffs by April 6, 1970, is unclear on this record. It is clear that onshore facilities were available to plaintiffs on July 21, 1970.

**33.** The California State Lands Commission refused to act on plaintiffs' request to construct a pipeline across state lands within the 3-mile limit. Interior suggested that plaintiffs write

the Commission informing them that Interior had authorized them to drill on their tract and that this permission was granted in accordance with the recommendations of the DuBridge Committee that drilling take place in the Dos Cuadras field to relieve pressure. Interior further advised that after plaintiffs sent such a letter to the Commission, Interior would authorize plaintiffs to drill without pipeline facilities being available to them. Plaintiffs wrote such a letter to the State Lands Commission, and Interior thereafter, on May 18, 1970, allowed plaintiffs to drill without pipeline facilities. Os-

While not clearly set forth in the record, it is reasonable to assume that Interior gave careful consideration to plaintiffs' request that it be allowed to deviate from their plan of development and drill before pipeline facilities were available. This required a determination that such drilling could be done safely without a possibility of pressure reaction. In allowing plaintiffs to drill without available pipeline facilities on May 18, 1970, defendant ostensibly made this determination on the basis of a thorough review of existing conditions. On the totality of the record, the actions of defendant during the period cannot be viewed as unreasonable. Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that defendant's actions during the period April 6, 1970—May 18, 1970, were unreasonable, unjustified or otherwise arbitrary.

### c. *The third delay claim period*

The first well on Platform Hillhouse was completed and ready to produce on June 16, 1970. However, plaintiffs did not commence oil and gas production from Platform Hillhouse until July 21, 1970. Plaintiffs seek delay damages for this 35-day period on the ground that defendant's failure to order cooperative development of Union Oil's Tract 402 and plaintiffs' Tract 401 on or before June 16, 1970, unreasonably delayed plaintiffs' production efforts. Plaintiffs' contentions, on this record, are found to be without merit.

While plaintiffs were ready to produce oil and gas on June 16, 1970, no pipeline facilities to shore were available for transportation of said production. There were two alternatives open to plaintiffs relative to pipeline facilities to shore. First, they could construct their own pipeline from Platform Hillhouse to shore. However, this meant crossing state and county submerged lands, and the California State Lands Commission refused to act on plaintiffs' request for permission to construct a pipeline across state lands, and the County of Santa Barbara refused to permit plaintiffs to build such a pipeline across county trust lands. Second, since Union Oil already had a pipeline running from their Platform A to shore, plaintiffs could construct a pipeline from Platform Hillhouse to Platform A and thereafter utilize Union Oil's pipeline to shore facilities. Plaintiffs, therefore, were forced under the circumstances to concentrate on the second alternative.

On March 19, 1970, Union Oil and plaintiffs ostensibly reached an agreement whereby Union Oil assigned 30 percent of its pipeline to shore facilities to plaintiffs. In anticipation of such use, plaintiffs completed construction on April 2, 1970, of a pipeline between Platform Hillhouse and Union Oil's Platform A. However, this assignment agreement between Union Oil and plaintiffs was contingent on the State Lands Commission approving said assignment in accordance with the terms of the Commission's right-of-way pipeline lease to Union Oil. By May 26, 1970, Union Oil had taken the position that it could not accept, in any event, production oil from plaintiffs' Tract 401 for transportation to shore in the absence either of approval by the State Lands Commission and/or a special order from Interior.

It is important to note that the second alternative available to plaintiffs also involved the State Lands Commission since Union Oil's pipeline crossed state submerged lands, and that Union Oil's pipeline to shore was subject to a right-of-way lease agreement between the state and Union Oil. More importantly, Union Oil's agreement with the state required, in the eyes of Union Oil and the state, state approval for any assignment or use of these pipeline facilities to other parties. The state was not disposed, initially, to allow plaintiffs, by assignment or otherwise, to utilize Union

tensibly, Interior felt that State Lands Commission's authorization would be forthcoming if they knew Interior was going to allow drilling

to commence and that hopefully pipeline facilities would shortly be available.

Oil's pipeline to shore for production purposes.[34]

Plaintiffs concede that the above impediments to oil and gas production existed. They contend, however, that defendant's failure to issue a directive to Union Oil on June 16, 1970, compelling Union Oil to carry plaintiffs' production through Union Oil's pipeline to shore primarily delayed its production efforts.[35] In support of this contention plaintiffs stress that defendant was under an implied duty to do "whatever is necessary to enable [plaintiffs] to perform," citing *Kehm Corp. v. United States*, 93 F.Supp. 620, 623, 119 Ct.Cl. 454, 469 (1950). However, that case also states: "The implication [implied duty] is sometimes defeated by circumstances."

Plaintiffs' implied duty theory springs from section 2(c) of the standard OCSL Act lease, which section was to be found in both Union Oil's lease and in plaintiffs' lease. (*See* text, *supra*, at pp. 794–795.) That section empowers the Secretary to require lessees operating in the same oil field to "operate under such reasonable cooperate * * * plan for the development and operation of the * * * field * * * as the Secretary [of the Interior] may determine to be practicable and necessary or advisable in the interest of conservation *which plan shall adequately protect the rights of all parties in interest, including the United States.*" (Emphasis added.)

The language of section 2(c), *supra*, manifests discretion in the Secretary, not a legal duty. The real question here is whether defendant acted so unreasonably as to require a finding that discretionary authority was exercised arbitrarily. The facts support a finding of reasonable actions by Interior under the circumstances.

On June 5, 1970, plaintiffs requested USGS to issue an order requiring Union Oil to accept plaintiffs' oil and gas production for transmittal to shore facilities. At plaintiffs' request a conference between representatives of Union Oil, Interior and plaintiffs was held on June 15 and 16, 1970, to discuss the matter. The position of Interior was that it would approve any cooperative agreement reached by plaintiffs and Union Oil and urged the companies to reach an agreement. However, the companies were unable to reach any agreement on the matter at the June 15–16 conference. The record does not disclose what all the specific disagreements were between Union Oil and plaintiffs. The record does suggest that these disagreements embraced more than Union Oil's concern over its pipeline lease agreement with the State Lands Commission that no pipeline assignment use would be made by Union Oil without Commission approval. Plaintiffs again requested Interior to issue a cooperative directive whereby Union Oil's pipeline would have to carry plaintiffs' production to shore.[36]

34. In an effort to obviate, if possible, the need to obtain state approval for the assignment worked out with Union Oil, plaintiffs sought, on June 5, 1970, to have defendant issue an order of cooperative development, pursuant to its power under section 2(c) of its standard lease agreement with Union Oil, directing and requiring Union Oil to transport plaintiffs' oil through its existing pipeline. Plaintiffs believed that if such an order were issued, state approval of Union Oil's assignment would not be necessary. However, the State Lands Commission did not view the Union Oil pipeline agreement with the state that way and, while not crystal clear in the record, it would appear Union Oil did not view its lease agreement with the state that way.

35. As indicated previously, Union Oil would not accept plaintiffs' production unless, *inter alia*, the State Lands Commission approved the pipeline assignment and/or Interior issued a special order directing it to do so. Plaintiffs' theory herein ostensibly is that a directive from Interior would supersede any state action prohibiting Union Oil from breaching its pipeline lease agreement by assignment use of said pipeline to plaintiffs. Such a situation, if confrontation became an actuality, could give rise to a serious federal-state question under the Tenth Amendment to the United States Constitution. Fortunately, there is no need to determine whether or not the OCSL Act gave authority to the Secretary to abridge contractual rights of the state, under the circumstances, since the state did approve the assignment on July 21, 1970.

36. It was not unreasonable for Interior to try and encourage voluntary cooperation between competitive oil companies before resorting to the ultimatum approach of directing unwilling

The record is unclear as to all the maneuvering that took place between June 16, 1970, and July 21, 1970. However, an inference is warranted that Interior put forth good faith efforts during this period to resolve the matter. First, USGS obtained authority from the Secretary to direct that both Union Oil and plaintiffs develop their tracts on a cooperative basis, that Union Oil transport plaintiffs' oil to shore in the Union Oil pipeline, and that Union Oil and plaintiffs work out the details themselves. This directive was sent to plaintiffs and Union Oil on July 21, 1970, and production by plaintiff commenced that day. Coincidentally, the State Lands Commission held a meeting on July 21, 1970, and authorized Union Oil's assignment of its pipeline to plaintiffs. The record suggests, by inference, that activities by Interior, behind the scene, was responsible in some measure for this harmonious resolution of a rather touchy problem. The fact that the State Lands Commission granted approval on the very same day that Interior directed cooperation between the companies suggests more than coincidence. It suggests spade work by a concerned party—Interior.

Plaintiffs argue strenuously that any cooperative directive by Interior would automatically entitle plaintiffs to utilize Union Oil's pipeline and that State Lands Commission approval would not be required. There is no probative evidence supporting this

view in the record and, as a matter of law, such a legal position is open to question. Moreover, it is quite possible that had such a cooperative directive been issued on June 16, 1970, and had Union Oil begun to transport plaintiffs' oil production through its pipeline, the state may have engaged in legal proceedings on the matter (see text and n. 13, supra) which might have delayed plaintiffs' production date beyond July 21, 1970.[37] On this record, it would appear that between June 16 and July 21, the state was persuaded to cooperate by granting approval to the pipeline assignment.

The evidence of record does not preponderate in favor of a finding that had Interior directed Union Oil to accept plaintiffs' oil production on June 16, 1970, plaintiffs would have been able to produce and transport their oil to shore through Union Oil's pipeline. There is too much uncertainty on this record to make such a finding. The record, also, will not support a finding that defendant's actions during the period June 16, 1970–July 21, 1970, were unreasonable under the circumstances.

The record as a whole will not support a finding that defendant's actions or inactions during the period April 25, 1969–July 21, 1970, were unreasonable, unjustified, or arbitrary. As a result, plaintiffs' claim for 112 days of delay damages must be denied.[38]

competitors to cooperate. Section 2(c) of the standard OCSL Act lease authorized the Secretary to resort to cooperative plans, in his discretion, but that he was to "protect the rights of all parties in interest." Plaintiffs were not to be favored at the expense of Union Oil and vice versa. Interior's approach to the matter was reasonable and proper. Moreover, the cooperative directive that was ultimately issued still required plaintiffs and Union Oil to work out the details. This written directive was a manifestation of Interior's efforts prior to July 21, 1970, to get the parties to work out the details for an agreement which Interior advised it would accept. The delay, in these circumstances, seems more properly to lie with the oil companies than with Interior. Interior cannot be faulted for delay in this regard.

37. Moreover, this record does not establish that Union Oil would have abided by such a directive if the State Lands Commission had em-

phasized its objections and called attention to Union Oil's lease obligations not to assign use of its pipeline without Commission approval. On this record it seems clear that both Union Oil and the State Lands Commission read their pipeline lease agreement as prohibiting any pipeline assignment use unless Commission approval was given. There is no evidence, nor is there any reasonable suggestion, in the record, that Interior had any control over or any manner of privity with the State Lands Commission. See Edison Sault Electric Co. v. United States, 552 F.2d 326, 333, 213 Ct.Cl. 309, 321–22 (1977); see also L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 563–64, 177 Ct.Cl. 870, 878–79 (1966).

38. Defendant maintains that, in any event, plaintiffs have waived their right to claim any breaches of the lease contract herein because, after knowledge of defendant's breaches, they elected to continue performance. It relies on

### Platform Henry

Plaintiffs proposed to develop the east side of Tract 401, in the Carpinteria oil and gas fields, by the installation of Platform Henry.

On December 29, 1969, plaintiffs submitted their plan of development for the east side of Tract 401 for approval, and on January 22, 1970, they applied for a permit to install Platform Henry. Public hearings were subsequently held on plaintiffs' permit application and thereafter a draft Environmental Statement on said application was prepared and made available for public comment.[39] The Final Environmental Statement was submitted to Secretary of Interior, Rogers C. B. Morton, on August 23, 1971. Secretary Morton denied plaintiffs' plan and permit applications on September 20, 1971, and amplified that denial with a "Statement of Decision" which he issued on November 3, 1972.

### a. Breach of contract

In challenging Secretary Morton's denial of their permit application, plaintiffs present three arguments in support of their contention that defendant breached the lease contract.

 First, plaintiffs maintain that political considerations were the primary cause of the denial and this fact serves to render said denial unlawful and improper. If plaintiffs were correct in their factual assertions, this contention would have some merit. *See, D. C. Federation of Civic Associations v. Volpe,* 148 U.S.App.D.C. 207, 222, 459 F.2d 1231, 1246 (1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *Center on Corporate Responsibility, Inc. v. Schultz,* 368 F.Supp. 863 (D.D.C. 1973). However, this record will not factually support such a contention.

The record indicates that Secretary Morton did seek guidance from the White House relative to plaintiffs' Platform Henry application, as well as Union Oil's Platform C application. However, in requesting White House views on these matters, Secretary Morton advised that he was not disposed to grant these permits. Touching base with the White House, in itself, was not unusual given the public interest in and concern about the environment in the Santa Barbara Channel. As a cabinet officer, it would seem that Secretary Morton had an obligation to keep the White House informed relative to matters of such public importance and to advise what course of action he intended to pursue. The record further reflects that personnel in the White House considered the political and legal pros and cons of alternative actions which could be taken on the matter. However, there is not enough reliable evidence in the record to preponderate in favor of a finding

*Ling-Temco-Vought, Inc. v. United States,* 475 F.2d 630, 636–39, 201 Ct.Cl. 135, 145–50 (1973) and other cases in support of this position. *See also Cities Service Helex, Inc. v. United States,* 543 F.2d 1306, 211 Ct.Cl. 222 (1976). Without elaboration, close analysis of the cases cited by defendant reveal that they rest on circumstances much different from those present in this case. The instant case is deemed to involve particular circumstances which allow for continued performance by plaintiffs without waiver of their right to sue for damages for partial breaches of the lease contract by defendant. The parties do not seem to regard the alleged breaches as material enough to have justified termination of the lease. Moreover, under the lease, continued performance by plaintiffs would seem to serve to mitigate damages rather than run up damages. Finally, plaintiffs paid $38,380,032 for the lease rights to drill for and produce oil and gas from defendant's land. Plaintiffs' leasehold rights permit them to continue exercising those rights and also to seek damages for any interferences by defendant with the exercise of those rights. *See Northern Helex Co. v. United States,* 455 F.2d 546, 550–54, 197 Ct.Cl. 118, 124–31 (1972). *See also Meva Corp. v. United States,* 511 F.2d 548, 557, 206 Ct.Cl. 203, 218 (1975). *See generally* 5 Williston, Contracts §§ 683–88 (3d ed. 1961).

**39.** The Environmental Statement was required by the National Environmental Policy Act of 1969, 83 Stat. 852, 42 U.S.C. § 4331 (1970) (NEPA). This requirement did not exist when the installation of Platform Hillhouse was under consideration. NEPA is an "environmental full disclosure law" which seeks to assure that potential environmental impacts are subject to thorough study and a detailed statement. *See Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 696–99 (2d Cir. 1972).

that political considerations, in fact, were significantly responsible for the denial action taken relative to Platform Henry.

As its second argument, and in essence connected with the first argument above, plaintiffs maintain that Secretary Morton did not make the decision denying Platform Henry's permit application but that, in fact, said decision was made by President Nixon.[40] Plaintiffs see this as a violation of the holding in *New York Shipbuilding Corp. v. United States*, 385 F.2d 427, 433–36, 180 Ct.Cl. 446, 457–61 (1967), and sufficient to require that the denial action be deemed improper and thus a breach of the lease agreement.

The thrust of plaintiffs' second argument is that, under the lease they were entitled to have decisions on Platform Henry made by the Secretary and not the President of the United States. The extent to which a President may permissibly direct the actions of his subordinate in the administration of contract matters is a most troublesome question. *Compare Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60 (1803) and *Kendall v. United States*, 12 Pet. 524, 37 U.S. 524, 610, 9 L.Ed. 1181 (1838); *with Congress Constr. Corp. v. United States*, 314 F.2d 527, 530–31, 161 Ct.Cl. 50, 55–56, *cert. denied*, 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52 (1963). The circumstances herein would require a careful appraisal of the holding of *New York Shipbuilding Corp. v. United States, supra*,[41] if it were necessary to confront this question.

Fortunately, this question can be pretermitted because of the absence of any necessary factual predicates.

■ The record in this case does not establish with any degree of reliability that President Nixon and not Secretary Morton made the decision to deny the Platform Henry permit. The record does indicate that Secretary Morton was disposed to deny the permit before he sought White House guidance. The more acceptable view, on this record, is that the White House agreed with Secretary Morton's decision to deny the permit and not that it directed such a denial or that President Nixon made the ultimate decision. In any event, there is a presumption, as indicated earlier (*see* text *supra* at pp. 804–805), that Secretary Morton properly performed his duties and that the decision denying the Platform Henry permit reflected his judgment on the matter. *See Pacific Architects and Engineers, Inc. v. United States*, 491 F.2d 734, 744–46, 203 Ct.Cl. 499, 516–20 (1974). Whether that judgment was right or wrong is another question. The presumption referred to above is not rebutted by conflicting newspaper accounts as to who made the definitive decision on the permit denial.

Plaintiffs' third and primary argument is that denial of the Platform Henry permit application was unjustified on the merits and in breach of the lease agreement. The record supports such a contention.

**40.** Plaintiffs' evidence in this regard consists of a newspaper account of remarks made by President Nixon wherein he was quoted as saying that he made the decision to deny the Platform Henry permit and Secretary Morton made the announcement of said denial. This same newspaper account, however, quoted Secretary Morton as saying that he made the decision to deny the permit after consultation with White House staff members. As indicated previously, there was no testimonial evidence in this record. *See Sun Oil Co. v. United States*, 514 F.2d 1020, 1025, 206 Ct.Cl. 742, 752 (1975).

**41.** In this case, the court held "that a contractor is entitled to a finding by the contractually-agreed officer [Nuclear Projects Officer of the Maritime Administration] and that a decision by someone else [Chief, Office of Research and Development of the Maritime Administration] is a nullity" (385 F.2d at 436, 180 Ct.Cl. at 461). More importantly, the consequences of such improper action in the *New York Shipbuilding Corp.* case was not a liability determination that the contractor receive damages because the decision was made by one not contractually agreed upon, but that the merits of the contractor's claims be tried in the court without recourse to the administrative determination. (385 F.2d at 436–37, 180 Ct.Cl. at 461–62). Accordingly, it is questionable, in any event, whether the holding of the *New York Shipbuilding Corp.* case would support a liability determination in plaintiffs' favor. Such a determination would have to be reached on the merits of the case. This is what is done hereinafter.

It is established that plaintiffs' plan of development for the east side of Tract 401 and its permit application for installation of Platform Henry complied with all applicable OCSL rules, regulations, and orders. It is further established that all subordinate officials of the Secretary recommended that he grant the permit to install Platform Henry. More importantly, the 1971 Final Environmental Statement found, *inter alia*, that Platform Henry was required in order to complete development of the Carpinteria oil and gas field since existing platforms (those of the Phillips group) would not permit complete recovery of reserves. This 1971 Final Environmental Statement found no conservation, environmental or other impediment to the granting of the permit to install Platform Henry. In the face of the above undisputed facts, the Secretary denied plaintiffs' permit to install Platform Henry. The question to be decided herein is whether the Secretary's denial was authorized and justified by the OCSL Act and implementing regulations, *i. e.*, would the installation of Platform Henry on or about September 20, 1971, pose a threat of harm to the Channel environment. If not, then the Secretary must be deemed to have breached the lease agreement which gave plaintiffs a clear right to install. Platform Henry.

▮▮▮▮ As indicated previously, the Secretary has broad powers and considerable authority to control lease operations in the Channel area on OCSL. However, that power and authority is not absolute. The Secretary has a duty and a responsibility to protect the Channel environment. However, he cannot breach vested contractual rights under the guise of protecting the Channel environment, if the exercise of those contractual rights pose no threat to the Channel environment. Conversely, the plaintiffs do not have an absolute right

under their lease to conduct Channel operations when, where, and how they please. Plaintiffs are subject to reasonable restraints on their lease rights when such restraints are based on sound environmental and/or conservation grounds. *Union Oil Company of California v. Morton, supra,* 512 F.2d at 750–52; *Gulf Oil Corp. v. Morton, supra,* 493 F.2d at 149–50.

Defendant argues that plaintiffs' right to develop the east side of Tract 401 has only been temporarily suspended. If this is so, justification must be found for the Secretary's authority to suspend lease operations.

Section 5(a)(1) of the OCSL Act, authorized the Secretary to issue regulations which would provide, *inter alia*, " * * * in the interest of conservation, for * * * suspension of operations or production * *." This is the only language in the OCSL Act dealing with the Secretary's power to suspend lease obligations in the Channel. The above language, however, has been viewed broadly and has been held to encompass environmental as well as conservation reasons. *See Gulf Oil Corp. v. Morton, supra.*

The Secretary, as authorized by the OCSL Act, amended existing regulations on August 22, 1969,[42] to provide that a lessee's operations may be suspended if that operation:

> * * * threatens immediate, serious, or irreparable harm or damage to life, including aquatic life, to property, to the leased deposits, to other valuable mineral deposits or to the environment. Such emergency suspension shall continue until in his [the Secretary's] judgment the threat or danger has terminated. [30 C.F.R. § 250.12(c).]

Whether the denial action by the Secretary is viewed as a temporary suspension or as a denial for an indefinite period of time,[43] the

---

**42.** Section 5(a)(1) of the OCSL Act empowered the Secretary to amend existing rules and regulations whenever he deemed it necessary for conservation of natural resources. Thus regulations adopted after the lease was entered into were binding on the parties. *See Union Oil Company of California v. Morton, supra,* 512 F.2d at 748–49. *See also Edison Sault Electric*

*Co. v. United States, supra,* 552 F.2d at 336, 213 Ct.Cl. at 309.

**43.** While the plan of development and application for an installation permit for Platform Henry had not been granted as of the closing of proof in this case, the activities of the parties relative to development of the east side of

validity of the denial action must be considered in the light of the OCSL Act and implementing regulations discussed above. The denial action of the Secretary must be examined to see if such action was justified on the grounds that installation of Platform Henry would be contrary to "the interest of conservation" and would pose "an immediate, serious or irreparable harm or damage to life, including aquatic life * * * or to the environment."

In his decision of September 20, 1971, Secretary Morton denied the Platform Henry installation permit "because of overriding environmental conditions." No such conditions were set forth in this terse decision. In a contemporaneous news release, Secretary Morton stated that Platform Henry was not approved because "new platforms to be installed on Federal leases seaward of the State Sanctuary are incompatible with the concept of the Federal Sanctuary" embodied in proposed legislation submitted to Congress on April 21, 1971.[44]

This cursory denial by Secretary Morton of plaintiffs' installation permit for Platform Henry on September 20, 1971, was made despite favorable recommendations from all subordinate officials in Interior. It was made in the face of the August 23, 1971, Final Environmental Statement, which was submitted to the Secretary but was ignored in his denial decision. This Statement failed to find that installation of Platform Henry would be contrary to the interest of conservation, nor did this Statement find that said installation would pose a threat or cause irreparable harm to the Channel environment. The 1971 Final Environmental Statement, which endorses installation of Platform Henry by force of language and reasoning, does not justify denial of plaintiffs' permit application without more substantial conservation and/or environmental reasons than those advanced by the Secretary in his decisional letter of September 20, 1971.[45]

■ Over a year later, on November 3, 1972, Secretary Morton issued a Statement of Decision wherein he listed the primary factors that led to his September 20, 1971, decision denying the Platform Henry permit application. In circumstances such as this, the Supreme Court has cautioned that, "[s]uch an explanation will, to some extent, be a 'post hoc rationalization' and thus must be viewed critically." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 1826, 28 L.Ed.2d 136 (1971). It should be noted that this same Statement of Decision also was applicable to Union Oil's Platform C and was the subject of decision by the Ninth Circuit in *Union Oil Company of California v. Morton*, *supra*. These factors, as stated by the Secretary, were as follows:

(1) construction of the proposed platform and drilling wells would increase the risk of oil pollution in the Santa Barbara Channel by reason of:

(a) the risks inherent in offshore oil drilling;

(b) location of the Channel in an active seismic belt; and

(c) with regard to Platform "C", the fact that the platform would be located on the damaged Dos Quadros [sic] structure;

Tract 401 indicate that the lease agreement between them as to said east side is existing, valid and binding. The drilling of exploratory wells on the east side in 1976 and 1977 suggests that the denial here in issue was not permanent but temporary.

44. This reason seemed "illogical" to White House personnel, an observation of considerable merit, since plaintiffs' Tract 401 was specifically exempted from the Federal Sanctuary legislation which Interior proposed for congressional consideration and approval.

45. The favorable conclusions supporting installation of Platform Henry set forth in the 1971 Final Environmental Statement were reaffirmed by USGS in its 1976 Final Environmental Statement, Oil and Gas Development in the Santa Barbara Channel Outer Continental Shelf off California. This Statement, issued on March 4, 1976, concluded that installation of Platform Henry would involve no different environmental impacts than would be found in any offshore drilling in the Santa Barbara Channel and would pose no unique risks or threats to the Channel environment.

(2) oil pollution in the Santa Barbara Channel would have adverse consequences, both short and longer term, because of the characteristics of the Channel environment; the following attributes of the Channel that would be affected by oil pollution were given particular consideration:

 (a) animal and plant marine life;

 (b) commercial and sport fisheries;

 (c) recreational use;

 (d) beaches and shore line of the Channel;

 (e) birds;

(3) the lack of systems and equipment which are completely effective in controlling and removing oil pollution under all weather and sea conditions;

(4) the suitability of the Dos Quadros [sic] structure (leases OCS–P 0241 and 0240) for unitization and the suitability of leases OCS–P 0240 and 0166 for unitization;[46]

(5) additional platforms would increase interference with other uses of the Channel for recreational and commercial fishing;

(6) additional platforms would be aesthetically undesirable.

█ ■ With respect to factors (2), (4), (5) and (6) there is no question but that these factors were known and undoubtedly considered when the lease was entered into. Accordingly, denial of the Platform Henry permit for these factor reasons was both unjustified and unreasonable. I agree with the Ninth Circuit in this regard. *See Union Oil Company of California v. Morton, supra,* 512 F.2d at 751; *see also United States Trust Co. of New York v. New Jersey,* 431

U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). As to factors (1) and (3), the Ninth Circuit in *Union Oil Company of California v. Morton, supra,* felt that these two factors suggested conditions which the development of new technology or further studies may lessen as threats to the environment. Knowledge of such risks, the Ninth Circuit observed, might serve to support denial of the permit application. However, the Ninth Circuit emphasized that the November 3, 1972, Statement of Decision, standing alone, was insufficient to justify the Secretary's decision as matters then stood.[47] (512 F.2d at 751–52.)

█ The record in this case contains no evidence relative to factors (1) and (3), *supra,* which would indicate environmental risks unanticipated at the time the lease was executed. As a result, those factor reasons must also be considered unjustified and unreasonable. Moreover, subsequent to the Ninth Circuit decision in *Union Oil Company of California v. Morton, supra,* the 1976 Final Environmental Statement was issued, as indicated previously, which found no conservation, environmental or other impediment to installation of Platform Henry.

█ The record in this case discloses rather clearly that installation of Platform Henry did not pose a threat to the Channel environment nor would its installation be contrary to the interests of conservation. Under these circumstances, the denial by the Secretary loses the rationale necessary for its validity. Moreover, the denial is not justified by any authority which flows to the Secretary from the OCSL Act and implementing regulations. All the recommendations received by the Secretary favored

---

**46.** Use of this factor reason by the Secretary is clearly unsupportable. The 1971 Environmental Statement on Platform Henry pointed out that unitization of leases OCS–P 0240 (plaintiffs' Tract 401) and OCS–P 0166 (Phillips Group's Tract 298) was not truly an alternative because maximum development of the Carpinteria field was not possible utilizing the Phillips Group's platform alone. As a result, installation of Platform Henry was necessary, contrary to the Secretary's implication, for maximum development of the Carpinteria oil and gas field.

**47.** The record does not indicate that further proceedings were conducted in the *Union Oil Company of California* case in conformance with the decision of the Ninth Circuit. In light of the 1976 Final Environmental Statement it is not unreasonable to conclude that the suggested possible risk conditions, hypothesized by the Ninth Circuit, which might serve to justify the Secretary's denial decision did not exist in the Channel.

granting the permit request. Two Final Environmental Statements favored the installation of Platform Henry. Nothing in this record supports the Secretary's denial decision. It must be concluded that denial of the plaintiffs' Platform Henry permit request on September 20, 1971, unreasonably interfered with and thereby breached plaintiffs' lease right to install such a platform. *See Neely v. United States, supra; Himfar v. United States*, 355 F.2d 606, 610, 174 Ct.Cl. 209, 215–16 (1966). *See also Peter Kiewit Sons' Co. v. United States*, 151 F.Supp. 726, 731, 138 Ct.Cl. 668, 675 (1957). Plaintiffs are entitled to recover delay damages until such time as defendant allows plaintiffs to install Platform Henry or until such time as defendant justifies on conservation and/or environmental grounds the "suspension," as defendant characterizes its actions, of Platform Henry installation efforts on the east side of plaintiffs' Tract 401.

■ The essence of defendant's position as to the installation permit for Platform Henry is that the Secretary's authority and responsibility under the OCSL Act and implementing regulations to protect the Channel environment from risk of harm was absolute enough to justify denial of the permit, regardless of whether the denial was unreasonable or unjustified. Such a broad position is untenable and cannot be accepted. *See Union Oil Company of California v. Morton, supra.*

■ As a corollary to the above position, defendant also argues that the Secretary's action in denying the permit application constituted a sovereign act, the exercise of which does not give rise to any governmental liability, citing *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); *Glasgow Associates v. United States*, 495 F.2d 765, 203 Ct.Cl. 532 (1974); and other sovereign act cases. In each of the cases relied on by defendant, the governmental action complained of had public and general applicability, the usual touchstone for sovereign

act applicability. *See Horowitz v. United States*, 267 U.S. 458, 460, 45 S.Ct. 344, 69 L.Ed. 736 (1925); *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 967, 173 Ct.Cl. 180, 196 (1965). In this case, however, the action taken by Secretary Morton in denying the Platform Henry permit, as well as the actions taken by Secretary Hickel with respect to Platform Hillhouse, were not actions of public and general applicability, but were actions directed principally and primarily at plaintiffs' contractual right to install a platform on Tract 401 and to extract oil and gas therefrom. The doctrine of sovereign immunity does not insulate defendant from liability in such instances. *Ottinger v. United States*, 88 F.Supp. 881, 883, 116 Ct.Cl. 282, 285 (1950).

### b. *Fifth amendment taking*

The parties devote a large portion of their briefs to the question of whether or not the Secretary's denial of the Platform Henry permit constituted a partial taking[48] of plaintiffs' leasehold rights to install such a platform and to extract oil and gas from Tract 401.

Defendant seems to imply that because the west side of Tract 401 was producing oil and gas from Platform Hillhouse, this production effort serves to preclude any taking claim as to development of the east side of Tract 401. However, partial takings are not strange animals in the law of federal eminent domain. *See United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

■ It is difficult to discern from plaintiffs' briefs whether they present their taking claim as an independent and additional claim or whether said claim is an alternative claim. The petition of plaintiff Marathon Oil describes the taking claim as an alternative claim. Since plaintiffs would only be entitled to one recovery from the permit denial, it would seem that the taking claim is an alternative claim to the breach of lease contract claim. Therefore, recov-

---

**48.** Since the parties by their actions believe that the lease is viable as to development of the

east side of Tract 401, a permanent taking at this time has not occurred in any event.

ery on one claim theory would seem to preclude recovery on the other claim theory. Recovery on the breach of lease contract claim has been allowed herein. However, because of the importance which the parties seem to place on the taking aspects of the Secretary's actions, the taking claim theory deserves consideration and discussion.

As a general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof. *Lemmons v. United States*, 496 F.2d 864, 873, 204 Ct.Cl. 404, 421 (1974). Further, authorized governmental actions can entail such an actual invasion of property rights that a constitutional taking can be implied. *Eyherabide v. United States*, 345 F.2d 565, 567, 170 Ct.Cl. 598, 601 (1965), and cases cited therein. *See also Benenson v. United States*, 548 F.2d 939, 212 Ct.Cl. 375 (1977). The fact that a taking is temporary, as contrasted with a permanent taking, is of no consequence in the law of federal eminent domain. *R. J. Widen Co. v. United States*, 357 F.2d 988, 996, 174 Ct.Cl. 1020, 1032 (1966), and cases cited therein. Eminent domain (taking of property) is to be distinguished from police power (regulation of property). However, if regulation is unreasonable or arbitrary relative to private property rights, the law of eminent domain applies. *See Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413–14, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

It is established that not every deprivation of use, possession, or control of property is a taking. One must look to the character and extent of any interference with property rights whenever a taking claim is asserted. *Finks v. United States*, 395 F.2d 999, 1004, 184 Ct.Cl. 480, 489, *cert. denied*, 393 U.S. 960, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968); *see generally* 2 *Nichol's Eminent Domain*, § 6.1 (rev. 3d ed. 1976). More importantly, the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been vol-untarily created by contract. *See J. J. Henry Co. v. United States*, 411 F.2d 1246, 1249, 188 Ct.Cl. 39, 46 (1969). In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim.

Plaintiffs and defendant entered into a lease agreement which set forth the rights and obligations of the parties conditioned only by the OCSL Act and implementing regulations. It has been said that when defendant "comes down from its position of sovereignty and enters the domain of commerce, it submits itself to the same laws that govern individuals there." *Cooke v. United States*, 91 U.S. 389, 398, 23 L.Ed. 237 (1875); *see also Perry v. United States*, 294 U.S. 330, 352, 55 S.Ct. 432, 79 L.Ed. 912 (1935). Defendant's lease operations in the Channel, therefore, more properly, represent activity by it in a proprietary capacity rather than a sovereign capacity. Accordingly, under the lease contract with plaintiffs, defendant obtained certain rights and incurred certain responsibilities as did plaintiffs. Remedies for violation of any of their lease rights by plaintiffs must be directed at defendant in its proprietary capacity and not in its sovereign capacity.

Before a taking can be established, it must be clear that there was an intent by defendant to take private property. Such an intent can be implied from the facts. *See Lemmons v. United States, supra*, 496 F.2d at 869, n. 5, 204 Ct.Cl. at 414, n. 5. On this record, and under the circumstances of the Union Oil blow out and its fearful and uncertain aftermath, it is difficult to discern an intent on the part of defendant to take temporarily plaintiffs' property. The interferences with plaintiffs' lease rights were grounded on matters that, at times material herein, bespoke an effort to operate within the framework of the lease and applicable regulations, not to take plaintiffs' property rights. If defendant's interferences were unjustified or unreasonable, plaintiffs' rights emanate from the lease agreement, not the Fifth Amendment.

■ Finally, the actions of the government representative on which a taking claim is premised must be authorized either expressly or by necessary implication, by some valid enactment of Congress. *United States v. North American Transp. & Trading Co.*, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920); *Hooe v. United States*, 218 U.S. 322, 335–36, 31 S.Ct. 85, 54 L.Ed. 1055 (1910). See *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).[49] The only language in the OCSL Act which expressly authorizes the Secretary to take plaintiffs' lease rights is to be found in 43 U.S.C. § 1341(c) where, in special national emergency or state of war situations, the Secretary is authorized to suspend lease operations and to pay just compensation to the lessee whose operations are suspended. No such situations are present in this case. The Ninth Circuit, when confronted with the issue of whether Secretary Morton's denial on September 20, 1971, as amplified on November 3, 1972, of Union Oil's request for a permit to install Platform C on the Dos Cuadras field constituted a taking, held:

> Congress' clear concern to distinguish police power regulation from invasion of property rights in these leases convinces us that Congress did not confer powers of condemnation upon the Secretary by implication.
>
> \* \* \* \* \* \*
>
> \* \* \* Such a taking by interference with private property rights is within the constitutional power of Congress, subject to payment of compensation. \* \* \* But Congress no more impliedly authorized the Secretary to take the leasehold by prohibiting its beneficial use than by condemnation proceeding. A suspension for which the fifth amendment would require compensation is therefore unauthorized and beyond the Secretary's power. [*Union Oil Company of California v. Morton, supra*, 512 F.2d at 750–51.] [50]

Plaintiffs' briefs, while alluding to this holding of the Ninth Circuit, fail to persuade that said holding is erroneous as a matter of law. I believe the Ninth Circuit was correct in its holding that the Secretary was without authority to take an OCSL Act lessee's leasehold rights.

■ For the above reasons, it is concluded that the Secretary's denial on September 20, 1971, of plaintiffs' application to install Platform Henry on the east side of Tract 401 did not constitute a partial taking of plaintiffs' leasehold rights.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to any recovery relative to the installation of Platform Hillhouse on the west side of Tract 401 under their lease with defendant and their petitions in this regard are dismissed; the court further concludes as a matter of law that

**49.** In *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934), relied on by plaintiffs, it was stated: " \* \* \* Rights against the United States arising out of a contract with it are protected by the Fifth amendment." The significant fact in the *Lynch* case is that *congressional* action abrogated the contracts in issue thereby giving rise to a taking by authorized governmental action. Interference by Congress, and not the Secretary, with plaintiffs' contractual rights is a necessary predicate for finding a valid taking claim here.

**50.** In other portions of its opinion following after the quoted portions set out above, the Ninth Circuit used the verb "take" in alluding to Secretarial action. Such a use, if it is viewed as implying a possible compensable Fifth Amendment taking by Secretarial action alone, is inconsistent and in conflict with the quoted portions of the Ninth Circuit opinion, *supra*. However, in the context of the total opinion, no inconsistency or conflict arises if one reads the opinion as holding that Secretarial action, adopted by the Congress or inducing Congress to cancel the lease, can result in a compensable Fifth Amendment taking; but that Secretarial action alone can only result in a compensable damage claim by way of a breach of the lease contract. Such a reading would give consistency to the holding that the Secretary acting alone had no authority to take plaintiffs' property for purposes of a Fifth Amendment just compensation award.

plaintiffs are entitled to recover damages for defendant's breach of plaintiffs' lease rights relative to installation of Platform Henry on the east side of Tract 401, and judgment is entered to that effect, with the determination of the exact amount of recovery to be made in further proceedings under Rule 131(c). Plaintiffs' petitions setting forth an alternative taking theory of recovery relative to installation of Platform Henry are accordingly dismissed.