James L. and Therese GRATZ, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–1107C.

United States Claims Court.

March 2, 1992.

Service properly called and ordered delivery of plaintiffs' loan collateral.

## FACTS

The following facts derive from the administrative record and are undisputed, unless otherwise noted. James L. and Therese Gratz ("plaintiffs") operate farms in Lafayette County, Wisconsin. During the period in question, plaintiffs participated in the Price Support, Farm Storage Grain Reserve and Special Producer (also known as "Production Adjustment") loan programs administered by the Commodity Credit Corporation (the "CCC") through the Lafayette County Agricultural Stabilization and Conservation Service (the "county ASCS" or "the committee") of the United States Department of Agriculture. Plaintiffs had numerous outstanding CCC loans at the time the events that give rise to these claims occurred. Plaintiffs seek damages for the calling and delivery of corn loan collateral by the Agricultural Stabilization and Conservation Service (the "ASCS").

*Regulatory framework*

The Department of Agriculture directs price support, grain reserve and special producer loan programs available to agricultural products producers. 7 U.S.C. §§ 1281–1469 (1988); 15 U.S.C. § 714 (1988). The CCC funds the various programs, while the ASCS administers their day-to-day operations. The ASCS maintains and directs price support and production adjustment programs entitling producers to loans at the county, state, and national levels.

The Price Support, Grain Reserve and Special Producer programs, among other features, allow a producer to borrow money against grain which the producer then holds as collateral. 7 C.F.R. §§ 713.49(b), (c), 1421.1–30, 1421.90–100, 1421.740–755, 1421.900–917 (1987). Normally, a producer signs a loan contract that specifies the specific rights and responsibilities of both the producer and the CCC. 7 C.F.R. §§ 713.-49–50. By regulation the producer is required to provide the Government with lien waivers from all grain collateral lienhold-

Michael A. Pinotti, Roseville, Minn., for plaintiffs.

Scott E. Ray, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on the parties' cross-motions for summary judgment. The issue for decision is whether the Department of Agriculture's Agricultural Stabilization and Conservation

ers.[1] 7 C.F.R. § 1421.10. Failure to comply with the terms of the contract subjects the producer to penalties and/or the calling (accelerated maturity) of loans. 7 C.F.R. §§ 713.49(d), 1421.6(d).

The county ASCS directs and administers the particular loan contracts and programs. Inspectors from county ASCS offices perform random checks on a producer's loan collateral in order to assure quality control. The county ASCS similarly checks whether any collateral is missing (unauthorized disposition). 7 C.F.R. § 1421.17(g). The county may, at any time in its discretion, call and/or order delivery of loan collateral. 7 C.F.R. § 1421.6(d).

*Quality control problems*

Between January 1982 (crop year 1981) and December 1987 (crop year 1986), plaintiffs stored corn in seven locations as collateral under 13 CCC loan contracts. Plaintiffs signed a "Farm Storage Grain Reserve Agreement" and a "Farm Storage Note and Security Agreement" ("FSNSA") in order to receive the contracts. The former provides, *inter alia,* that the producer will not earn storage payments if the producer "negligently or otherwise impairs the commodity."

The FSNSA states the circumstances under which a producer will be held personally liable for the amount of a loan:

(j) Loss in Quantity or Quality. The producer is responsible for any loss in quantity or quality of the commodity placed under farm-storage loan.... [P]hysical loss or damage occurring after disbursement of the loan funds will be assumed by the CCC ... if the producer established to the satisfaction of the CCC ... (1) the physical loss or damage occurred without fault, negligence, or conversion on the part of the producer or anyone else having control of the storage structure; (2) the ... damage resulted

from an external cause (other than insect infestation, rodents, or vermin....)

*See* 7 C.F.R. § 1421.15.

The county ASCS made periodic inspections of the corn to ensure freshness, coolness, and lack of weevil infestation. On May 6 and 11, 1987, the county ASCS inspected several of plaintiffs' storage sites. Inspectors noted quality control problems at seven storage locations:[2] 1) Moore farm flat storage, Contract No. 86–74–1 ("corn in west end moldy [with] weevil[s] [in] top 1–2 ft; south bulkheads marginal and bowed."); 2) Moore farm bin, Contract No. 85–350–1 ("mold/crust on north"); 3) Harold Gratz farm, only bin, Contract No. 84–28–1 ("mold on top; Jim should remove some of this corn....; crust covered area access."); 4) Harold Gratz farm middle bin, Contract No. 86–17–2 ("warm spot in center of bin ... should be levelled or broken up with shovel."); 5) Harold Gratz farm east bin, Contract No. 85–23–1 ("weevils are heavy by door—no inside ladder—looks crusted on south side."); 6) Koesche farm small bin, Contract No. 81–166–2 ("moldy lumps still on top...."); and 7) Koesche farm flat storage building, Contract No. 85–154–1 ("west ⅓ of shed [has] heavy weevil feeding [on] entire surface...."). While the inspectors gave "questionable" ratings to two of these sites (Contract Nos. 84–28–1 and 85–23–1), they rated other sites as satisfactory despite these deficiencies.

By letter of May 19, 1987, county ASCS Executive Director Leon N. Wolfe advised plaintiffs of these deficiencies and requested that they redeem (exchange) 10,000 bushels from Contract No. 85–154–1 by June 18, 1987, to prevent spoilage. Mr. Wolfe also requested that plaintiffs redeem 200 to 300 bushels from Contract No. 84–28–1 and meet with the county ASCS to discuss these problems along with possible new crop rotation. The record does not indicate that plaintiffs ever redeemed the corn.

---

**1.** Lien waivers are not required if the lienholder executes a Lienholders Subordination Agreement. No such agreement exists in this case.

**2.** The ASCS inspectors had given "questionable" ratings to plaintiffs corn on three prior inspections.

On May 26, 1987, Mr. Gratz met with the county ASCS. To address the committee's concerns, he presented a plan to redeem 4,000 bushels with certificates and rotate another 20,000 bushels. The county ASCS approved this plan, but reminded Mr. Gratz that "corn sold under rotation must be deposited ... in [the] Reserve Rotation Fund [and] [a]s soon as new corn is in place and inspected by our office the amount of the original deposit will be reissued to you...."

Relying on a chronological summary dated May 12, 1988, defendant claims that the county ASCS advised Mr. Gratz at the meeting that "rotation [could] ... begin approximately August 1, 1987 *provided all necessary lien waivers are obtained* ...." (Emphasis added.)[3] Plaintiffs contend that they "were not informed of the ... decision to require ... lien waivers as a condition to replacing the corn until after delivery was completed." Plfs' Proposed Findings of Uncontroverted Facts No. 26, filed Oct. 28, 1991.[4] A June 8, 1987 confirming letter is silent on the issue. No document prepared contemporaneously with the May 26, 1987 meeting indicates whether the county ASCS notified plaintiffs of the lien waiver requirement.

The "Farm Storage and Security Agreement" signed by plaintiffs for each loan provided that "[t]he producer represents and warrants that ... the collateral commodity is free and clear of all liens ... except in favor of the lienholders from whom waivers have been secured...."

On July 31, 1987, plaintiffs formally requested approval to rotate 20,000 bushels. On August 3, 1987, the county ASCS approved the request contingent upon receipt of any lien waivers. During a lien search conducted that same day, the county ASCS found two outstanding liens. While one

lienholder, Citizens Bank, returned a completed waiver form to the county ASCS on August 7, 1987, none was received from the other lienholder. Plaintiffs delivered 21,285 bushels of rotated corn between August 4 and August 22, 1987. On September 2, 1987, the other lienholder, Farm Credit Services, informed the county ASCS that it could not provide a lien waiver.

County ASCS personnel reinspected plaintiffs' corn on August 4, 1987. They noted some improvements: Contract No. 86–74–1 ("550 bushels removed ... did not see weevils action on corn, but some on outside boards; no warm spots."); and Contract No. 85–23–1 ("little moldy crust on back side ... rest looks good."). Other corn storage sites had little noticeable change (Contract Nos. 86–17–2, 81–166–2), while others had deteriorated (Contract Nos. 85–350–1 and 85–154–1). Nevertheless, inspectors inexplicably gave "satisfactory" ratings to all but one contract and upgraded one from "questionable" to "satisfactory."

*Storage problems*

Meanwhile, on June 18, 1987, the county ASCS notified plaintiffs that farm-stored corn Loan Nos. 18 and 74 would mature on July 31, 1987. The committee gave plaintiffs four options: 1) deliver the commodity to the CCC; 2) redeem the collateral by repaying the loan plus interest; 3) redeem the loan with earned or purchased commodity certificates; or 4) extend the loan for one year. On July 18, 1987, plaintiffs chose the last option.

In a July 30, 1987 letter, the county ASCS agreed to extend the loans, but informed plaintiffs that "before we can pay storage, we must have a statement in writing for the facilities that you do not own showing that you have use of these facilities for storage the next year."[5] Plaintiffs

---

**3.** This summary is under the committee's letterhead. No indication of specific authorship is provided. To the extent that this summary alludes to events and meetings not independently corroborated in the record, the court does not rely on it as a basis for decision.

**4.** The administrative record reflects that from October 1982 to October 1986, 13 lien waivers were filed on plaintiffs' behalf with the County

ASCS listing liens held by Citizens National Bank, Darlington, Wisconsin.

**5.** An unsigned Commodity Loan Check Sheet states, as follows: "On storage facilities not owned by the borrower, producer must have signed rental agreements in our files before a loan will be approved...."

did not furnish the county ASCS with the requested statements.

On September 14, 1987, the county ASCS met in an executive session to consider the commodity loan program. The committee reviewed plaintiffs' matured loans, taking note of a court order "which may [have] prevent[ed] Jim Gratz from harvesting 1987 crops from a significant part of his 1987 corn acreage." Consequently, the committee decided to "hold up all 1986 final deficiency payments until matured loans [were] ... delivered or settled and corn rotation problem [was] ... settled."

The committee also noted three additional problem areas: 1) failure to provide proof of storage for an additional year; 2) financial inability to rotate (lien release on 1987 crop); and 3) continuing quality problems at several storage locations. Due to these problems, the committee decided to call all of plaintiffs' remaining corn loan grain reserve agreements.

On September 17, 1987, county ASCS personnel reinspected some of plaintiffs' corn. These inspections yielded results similar to those reported previously. Corn at several storage locations was deteriorating (Contract No. 81–166–2), others had stabilized (No. 85–23–1), and still others had improved (No. 85–350–1). Again, the inspectors only rated one contract as questionable.

At a September 21, 1987 executive session, the county ASCS reviewed measurements of corn stored by plaintiffs under Contract No. 85–154–1. The committee discussed a 5,000–10,000 bushel shortfall in corn stored and determined that the shortage was an unauthorized disposition of loan collateral in violation of the Farm Storage Note and Security Agreement. Consequently, the county ASCS reaffirmed its earlier decision to issue delivery notices on the three matured 1986 loans for which plaintiffs had requested extensions and to call all remaining loans.

By letter of September 23, 1987, the county ASCS informed plaintiffs of the unauthorized disposition determination. The letter explained that "the maturity date on your loan has been accelerated and liqui-

dated damages ... will be assessed on the quantity disposed of without authorization." Plaintiffs were given ten days to repay the loan and applicable penalties.

By separate letter of the same date, the county ASCS notified plaintiffs of the calling of their 1982, 1984, and 1985 corn loans "because of loss of storage space and continuing corn quality problems." This letter also requested delivery of plaintiffs' matured 1986 loans. Plaintiffs were given ten days before actual delivery was required on the 1982, 1984, and 1985 loans. Neither letter informed plaintiffs of appeal rights.

On October 13, 1987, the county ASCS sent plaintiffs delivery notices for the remaining corn loans. The letter set forth plaintiffs' responsibilities to "monitor grade and quality from each truck load" of corn delivered to the federal warehouse. However, in an October 15, 1987 executive session, the county ASCS noted that "Mr. Gratz has not cooperated with the warehouseman in loading out corn under delivery notices.... [U]sually [the Gratzs] were not around...."

By October 27, 1987, plaintiffs still had not provided rental statements for those storage sites which they did not own. As a result the county ASCS resolved "to take action to complete the deliveries of all [such] remaining corn." The committee notified plaintiffs by letter dated November 19, 1987, that the ASCS "has decided to arrange for delivery of corn stored at" the Moore cattle shed, the machine shed at the former Koesche farm, and two bins at the Koesche farm. The committee gave plaintiffs until December 1, 1987, to comply with this delivery order.

Mr. Gratz met with the county ASCS on December 14, 1987. He told the committee that he still owned the Moore farm and that he would negotiate with the owner of another storage bin for continued corn storage. He also mentioned that he had access to another bin at the Tuescher farm. The record does not indicate whether plaintiffs ever supplied the ASCS with rental agreements from these individuals.

The committee reconvened on December 18, 1987, to review bin measurements and corn samples. The committee again determined that the corn in the two flat storage facilities was heating and crusting. On January 6, 1988, the county ASCS decided to issue delivery notices on that corn due to unauthorized disposition, corn quality, passed due maturity dates, and lack of storage agreements. The committee informed plaintiffs in a subsequent letter that they had a right to appeal its decision. On January 13, 1988, plaintiffs appealed the committee decision in a one-paragraph letter.

At a January 26, 1988 meeting the county ASCS discussed plaintiffs' appeal. In particular the committee reviewed the quality of plaintiffs' corn delivered to warehouses pursuant to the calling of their loans. The Moore farm corn was musty and sour, and the Koesche farm corn had significant water damage. Despite these problems the committee agreed to reinstate plaintiffs' loans for corn on the Harold Gratz and Estate farms. The committee, however, did order the corn in the large bin at the Koesche farm "delivered due to questionable quality and lack of control of storage structure." A contemporaneous notification letter to plaintiffs informed them of their appeal rights.

On February 10, 1988, the county ASCS informed plaintiffs that an additional shortage of corn had been discovered at the West bin at Ed's Dairy. The committee determined that this shortfall was unauthorized disposition of loan collateral. The committee further noted that quality problems continued at the Koesche farm machine shed and at the Moore farm. Finally, the committee discovered that plaintiffs had refused to allow McKenna grain to remove corn from the Koesche farm's large bin pursuant to delivery notices. Consequently, the committee decided to recall all of plaintiffs' remaining corn under loan. The committee accorded plaintiffs ten days to repay the loans before it would issue delivery notices. Plaintiffs had 15 days to appeal the decision.

On February 22, 1988, plaintiffs, through counsel, wrote to the county ASCS requesting, *inter alia*, that the committee rescind the unauthorized disposition determinations. On March 8, 1988, the county ASCS heard plaintiffs' appeal. On March 14, 1988, the committee declined to change the unauthorized disposition determination finding, but allowed plaintiffs to redeem 5510 bushels toward the corn shortfall. Again, the committee informed plaintiffs of their appeal rights to the state ASCS.

*The state appeal*

Plaintiffs appealed the county ASCS decision to the Wisconsin State ASCS Committee. On April 4, 1988, the state committee heard plaintiffs' appeal. On April 12, 1988, the state ASCS affirmed the county ASCS' decision to call all loans due to quality problems and plaintiffs' failure to provide written lease agreements for those storage areas that they did not own. The state committee also informed plaintiffs that it would restore their loans for corn stored on the Harold Gratz farm if a written lease was turned in within two weeks. The state committee reversed the county ASCS decision as to unauthorized disposition. The state appeal decision letter also informed plaintiffs of their appeal rights.

On April 13, 1988, the county ASCS assessed the state ASCS' action. The committee decided that corn from the large storage bin at the Koesche farm should be delivered within ten days. Consistent with the state ASCS decision, the county ASCS required that plaintiffs furnish an official lease for the Harold Gratz farm in order to have those loans restored.

When by April 27, 1988, plaintiffs had not begun the required delivery from the Koesche farm or supplied a lease agreement for the Harold Gratz farm, the county ASCS decided to begin delivery on the Morissey (presumably the Koesche) farm. The committee allowed plaintiffs time to supply a written lease for the Harold Gratz farm. Plaintiffs proffer a handwritten note dated May 12, 1988, signed by Harold Gratz purporting to lease bins at the Harold Gratz farm for 1988.

The state ASCS wrote plaintiffs in early May 1988 in response to plaintiffs' request to rescind the Morissey farm delivery notices. Plaintiffs presented a written lease for the farm storage, and the ASCS rescinded the calling of those particular loans.

On July 12, 1988, plaintiffs appealed the state ASCS decision to the Deputy Administrator, State and County Operations (the "DASCO"). On November 23, 1988, the DASCO concluded that "the county committee acted properly within its delegated authority...." However, the DASCO restored any loan which "was not called due to deteriorating condition." Despite a December 22, 1988 letter reminding plaintiffs of their right to reinstate certain loans, the record does not indicate plaintiffs' exercising those rights.

Plaintiffs commenced an action in the Claims Court seeking damages in the amount of $315,272.17 representing the alleged value of the corn delivered to the ASCS.

## DISCUSSION

Although the plaintiffs raise eight issues, the central issue is whether the ASCS acted rationally and within its statutory authority when it called and delivered plaintiffs' grain collateral.

### 1. *Limited judicial review*

■ A court has limited authority to overturn administrative factual determinations. *Willson v. United States*, 14 Cl.Ct. 300, 304 (1988). Its duty is to " 'scrutinize whether the officials acted rationally and within their statutory authority.' " *Id.* (quoting *Raines v. United States*, 12 Cl.Ct. 530, 536 (1987) (citations omitted)). An agency's legal determinations may be reviewed for arbitrariness and capriciousness. *Gross v. United States*, 205 Ct.Cl. 605, 618, 505 F.2d 1271, 1279 (1974). The administrative record constitutes the only

acceptable source for this court's review. *See Willson*, 14 Cl.Ct. at 304.[6]

### 2. *Substantive due process*

Plaintiffs initially contend that the ASCS denied them their substantive due process rights: (1) by calling loans due to quality control problems when county inspectors had rated most of the contracts as "satisfactory;" (2) by requiring proof that plaintiffs had sufficient storage space specifically leased in their names; and (3) by requiring lien waivers on the corn collateral.

■ 7 C.F.R. § 1421.6(d) (1987), provides, in pertinent part, that the "CCC may, *at any time*, accelerate the time for repayment of a price support loan indebtedness." (Emphasis added.) Thus the county ASCS and DASCO have the regulatory authority to call loans subject only to a court's determination of whether such a decision is arbitrary or capricious. *See Gross*, 205 Ct.Cl. at 618, 505 F.2d at 1279.

■ Plaintiffs claim that the county ASCS made an arbitrary decision by disregarding the inspection reports of its own inspectors. Plaintiffs also assert that the Government inspectors did not grade the inspected corn according to Federal Grain Inspection Service ("FGIS") standards. Plaintiffs argue that the ASCS could only reject the corn if inspectors had graded it "sample".

The court recognizes that 7 C.F.R. §§ 1421.92, 1421.748, 1421.909, state that corn quality determinations shall be based on FGIS standards *i.e.*, U.S. Nos. 1–5 or U.S. Sample grade, derived by determining the percentage of damaged kernels, broken corn, and foreign material per bushel. 7 C.F.R. §§ 810.402, 810.404. By contrast, however, Farm Storage Loan worksheet Form 677–1, used by the county committee to record and evaluate grain amounts and quality, provides for a "satisfactory" or "questionable" rating followed by a space for inspectors' remarks. It is unclear

---

**6.** Plaintiffs allege that the "certified administrative record is incomplete." Plfs' Counter Statement of Facts, filed Jan. 15, 1992, at 1. However, the administrative record is the sole source for the purposes of the court's review of the ASCS and DASCO decisions. This court must defer to the agency's factual findings that are contained in the administrative record. *Willson*, 14 Cl.Ct. at 304 (citing 7 U.S.C. §§ 1385, 1429 (1982)).

whether the ASCS inspectors used FGIS criteria in assessing plaintiffs' corn.

The written comments on the worksheets describe in detail weevil infestation and crusting problems. Later evaluations prepared by the county committee noted excessive moisture problems and, in some cases, complete destruction of portions of plaintiffs' corn. While this court considers that an inspection form more closely conforming to the FGIS criteria would have been preferable, it is apparent in this case that the inspectors' Form 677–1 reports were sufficiently comprehensive to provide the DASCO with a rational basis for affirming the county committee's decision to call plaintiffs' loans due to quality concerns.[7]

■ County ASCS inspectors gave satisfactory ratings to many of plaintiffs' corn collateral contracts. However, at the same time, the inspections revealed quality problems at most corn collateral locations. As noted, county ASCS inspectors made detailed notations describing weevil infestation, crusting, heating, and water damage. The county ASCS found the initial May 1987 inspections serious enough to warrant asking Mr. Gratz to meet with the committee. Thus, the county ASCS did not disregard its own inspectors' reports. Rather, the committee acted on the totality of those inspections, looking beyond the "satisfactory" rating.

"[Q]uestions as to grain quality ... are peculiarly within the expertise of the local, state and federal officials who are in charge of the ASCS price support programs." *Frank's Livestock & Poultry Farm v. United States*, 17 Cl.Ct. 601, 606 (1989), *aff'd*, 905 F.2d 1515 (Fed.Cir.1990).

Given the statutory authority to call loans (7 C.F.R. § 1421.6(d)) and the ASCS inspectors' detailed quality notations, this court cannot conclude that the county ASCS or the DASCO acted arbitrarily in calling plaintiffs' loans, even though the inspectors rated the grain satisfactory in most cases.[8]

■ This court similarly cannot rule that the ASCS committee acted arbitrarily when it required plaintiffs to submit lease agreements demonstrating adequate storage space for the upcoming year. No specific regulation mandates such agreements. However, requiring participants in the grain reserve program to submit lease agreements must be viewed in context. Plaintiffs needed adequate storage space to protect government property, the corn collateral. Even if plaintiffs experienced no quality problems to this point, the ASCS acted well within its authority to require lease agreements. Farmers in the grain reserve program store government property; a requirement that farmers assure storage availability to the Government's satisfaction is both rational and appropriate.

■ Plaintiffs also charge that the ASCS committee effectively prevented corn rotation by requiring lien waivers. The record does not indicate whether the committee informed plaintiffs of this requirement contemporaneously with the tentative May 26, 1987 rotation approval. The ASCS committee's June 8, 1987 letter memorializing the May 26, 1987 meeting with Mr. Gratz does not mention the waiver requirement.

Plaintiffs argue that this lack of notice violated their substantive due process rights. The facts militate against such a conclusion. The "Farm Storage and Secur-

---

7. Even were this court to hold that the ASCS acted inconsistently with the provisions of the CCC Charter Act by not conforming to the applicable FGIS quality regulations, plaintiffs would not prevail. The inspectors' reports satisfactorily appraised the condition of plaintiffs' corn. From May 26, 1987, plaintiffs were on notice of these problems and seemingly never addressed them. Finally, in their briefs before this court, plaintiffs only take issue with the committee's disregarding their own inspectors' reports, *e.g.*, Plfs' Br. filed Jan. 13, 1992, at 5, not the criteria used to prepare those reports.

8. Plaintiffs argue that the ASCS is estopped from calling its loans because the county ASCS was not authorized to disregard the reports of its own inspectors. Plaintiffs ignore the totality of the inspectors' findings—to wit, almost every inspection noted some kind of quality problem. The ASCS committee, moreover, notified plaintiffs of its concerns early on. Indeed, over three months passed before the county ASCS took any action to call plaintiffs' loans.

ity Agreement" signed by plaintiffs for each loan contract provides that "[t]he producer represents and warrants that . . . the collateral commodity is free and clear of all liens . . . except in favor of the lienholders from whom waivers have been secured." Furthermore, 7 C.F.R. § 1421.10 states: "[I]f there are any liens or encumbrances on the commodity, waivers . . . must be obtained." Finally, from 1982 to 1986, lien waivers for plaintiffs' corn had been submitted numerous times.[9] At the very least, plaintiffs had constructive notice of the lien waiver requirements and the ASCS had the regulatory authority to require them.

### 3. *Procedural due process*

█ Plaintiffs contend that the ASCS violated their procedural due process rights by failing to notify them of their rights to appeal the calling of various loans before beginning corn delivery to warehouses. Assuming, *arguendo*, that the Claims Court can entertain such constitutional claims, plaintiffs' contentions are meritless.

Plaintiffs essentially argue that procedural due process required the county ASCS to give them an appeal hearing before calling the loans and ordering delivery of their corn. 7 C.F.R. § 780 articulates a producer's appeal rights after an adverse decision by the county ASCS. These regulations entitle the producer to an initial reconsideration by the county ASCS and appeals thereafter at the state and national levels. 7 C.F.R. §§ 780.3–5. The regulations do not prescribe that appeal hearings occur before the ASCS calls or orders delivery on grain collateral. "[S]ubsequent hearings provided at the county, state and federal levels satisfy any applicable due process requirement." *Frank's Livestock and Poultry*, 17 Cl.Ct. at 606, *aff'd*, 905 F.2d at 1518.

Beginning in January 1988, plaintiffs appealed the county ASCS' decision at every level. They were thus able to present their position on administrative review regarding the county ASCS' decision. Furthermore, plaintiffs received correspondence from the county ASCS numerous times and met in-

formally with the county committee on several occasions. Thus, plaintiffs cannot claim that they did not understand the basis for the ASCS' findings.

### 4. *Unconstitutional taking*

█ Plaintiffs assert that they had "a property right to the liquidated contracts." Plfs' Br. filed Oct. 28, 1991, at 20. They contend that DASCO unconstitutionally liquidated these property rights by allowing the Government to use proceeds from the delivered corn for its own benefit. It has been established that the ASCS/DASCO acted rationally and within their authority in calling plaintiffs' loans.

█ A taking can occur only when the Government acts in its sovereign capacity. *Sun Oil v. United States*, 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978). When the Government "enters the domain of commerce . . . this represents activity by it in a proprietary [rather than] . . . a sovereign capacity." *Id.* The Government's actions do not constitute a taking.

Plaintiffs entered into a contract with the ASCS under the auspices of the CCC and the Department of Agriculture. The Government loaned plaintiffs money in exchange for plaintiffs' promise to repay and store sufficient collateral to cover the loan. This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiffs' sole remedy is a breach of contract action.

### 5. *Unconstitutional regulation*

Plaintiffs argue that 7 C.F.R. § 1421.-748(d) is unconstitutionally vague because it fails to specifically list under what conditions a county committee can overrule the decisions of its own inspectors. In *Frank's Livestock and Poultry*, a producer denied entry into the CCC price support program complained that the ASCS failed to follow the language of 7 C.F.R. § 1421.748(d). The Federal Circuit held that the ASCS' interpretation of the regulation was reasonable and that the factual findings at issue

---

**9.** One Farm Security Note lists Citizens Bank as    the payee on the loan.

were, in any case, unreviewable. 905 F.2d at 1517.

The regulation in question is specific and easily understood. The county ASCS exercised its authority under 7 C.F.R. § 1421.-748(d) and other provisions of the regulation to assure that loan collateral would not deteriorate to the Government's detriment. The county committee consistently and specifically explained to plaintiffs that the quality of their corn was unacceptable. Any lack of notice or vagueness arose out of plaintiffs' inability or unwillingness to conform their corn collateral to the standards required by the county ASCS.

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment is denied, and defendant's cross-motion is granted. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No Costs.