**MNS WIND COMPANY, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 04–1569C.**

United States Court of Federal Claims.

May 15, 2009.

George T. Caplan and Bryant S. Delgadillo, Kaye Scholer LLP, Los Angeles, CA, for Plaintiff.

Bryant G. Snee, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., counsel of record for Defendant, with whom were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, United States Department of Justice, Washington, D.C.; of counsel were Sharon Hejazi and Paul Michael, United States Department of Energy.

## OPINION

DAMICH, Judge.

This case is before the Court on cross motions for summary judgment regarding liability. MNS Wind Company, LLC ("MNS Wind") alleges that the Government breached an easement agreement under which MNS Wind was to develop and operate turbines for a wind-energy farm on a former nuclear weapons testing site in Nevada. The agreement provided that the easement would not become effective until the U.S. Department of Energy ("DOE") completed a review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. DOE ultimately decided not to complete the NEPA process and MNS Wind filed suit.

According to the Government, when DOE prematurely terminated the NEPA process, a condition precedent to the agreement went unfulfilled, preventing formation of the contract and any breach of it. However, the Court has determined that the Government assumed a duty to complete the NEPA process by promising in the agreement to issue the appropriate environmental document. When the Government elected not to issue the environmental document necessary to complete the NEPA process and the NEPA condition went unmet, the Government breached the agreement. Accordingly, the Government's Motion for Summary Judgment is denied. At this stage, MNS Wind seeks only to establish the Government's liability, without addressing damages yet. As to liability, MNS Wind's Motion for Partial Summary Judgment is granted.

## I. Background

Historically, DOE's Nevada Test Site was used for nuclear weapons testing. Compl. ¶ 1; Answer ¶ 1. After a 1992 moratorium on nuclear testing, DOE established the Nevada Test Site Development Corporation ("NTSDC") in response to Congressional direction to "minimize the social and economic impacts on workers and communities affected by downsizing of defense-related facilities." Notice of Intent to Prepare Environmental Impact Statement, 66 Fed.Reg. 38,648 (July 25, 2001) (citing the National Defense Authorization Act for Fiscal Year 1993, Pub.L. No. 102–484, § 3161, 106 Stat. 2315, 2644 (1992) (codified as amended at 50 U.S.C. § 2704)). NTSDC encouraged non-defense and private sector development at the Nevada Test Site, including the proposed wind farm at issue here. *See id.*

In December 2000, DOE and NTSDC executed an easement agreement for the benefit of MNS Wind. Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact ("DRPPFUF") ¶¶ 1–2, Nov. 21, 2005. The easement agreement followed negotiations that addressed a variety of the parties' concerns, including potential revocation of the easement for national security purposes and the statutorily-required environmental review process under NEPA. *See id.* ¶¶ 6–7.

Both MNS Wind and the Government harbored concerns regarding national security. As part of its current mission, the Nevada Test Site must remain ready to resume nuclear testing if ordered. *See* Answer ¶ 1. Moreover, the Nevada Test Site borders the U.S. Air Force's Nevada Test and Training Range on three sides. Withdrawal of Notice of Intent to Prepare an Environmental Impact Statement, 68 Fed.Reg. 1448 (Jan. 10, 2003). Before the easement agreement was executed, the United States Air Force informed DOE that a wind farm could impact its operations, and discussions about such impacts continued over the following two years. DRPPFUF ¶ 5.

During negotiations, MNS Wind indicated to DOE that it could not invest in the wind farm project "only to have its rights terminated for national security reasons without compensation." DRPPFUF ¶ 7. A revocable use permit of the type DOE had normally used was unacceptable to MNS Wind. *See id.* Rather, "a non-revocable document for an extended term, such as an easement, was essential in order to secure commercial funding." *Id.* ¶ 6.

Accordingly, the easement agreement executed in December 2000 was revocable for only a limited set of reasons, one of which was national security. App. to Def.'s Mot. for Summ. J. ("Def.'s App.") 20. While the parties agreed that the Government could revoke the Easement in the interest of national security, they also agreed that if the easement was revoked for national security purposes, that revocation would be accomplished by eminent domain. DRPPFUF ¶ 3.

▮ The easement agreement also made allowances for an environmental review, stating that the easement would not become effective immediately upon its execution in December 2000. Def.'s App. 37. Rather, only after DOE had completed the NEPA-mandated review of the project would the easement become effective. *Id.* NEPA, described as an "environmental full disclosure law," requires federal agencies to study the environmental impacts of their proposals. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 812 n. 39 (1978). If a proposed action significantly affects "the quality of the human environment," the agency must prepare a detailed statement of its environmental impact called an environmental impact statement ("EIS"). 42 U.S.C. § 4332(2)(C).

To decide whether an EIS is required, the NEPA process begins with preparation of a brief Environmental Assessment ("EA"). 40 C.F.R. § 1501.4. On the basis of the EA, agencies decide whether a more detailed EIS is appropriate. *Id.* If an agency decides that an EIS is not necessary, it issues a Finding of No Significant Impact. *Id.* Otherwise, the agency prepares an EIS. *Id.* In an EIS, an agency must study the environmental impacts of its preferred action and various alternatives, including the possibility of taking no action at all. *Id.* § 1508.25(b).

In this case, DOE began preparing an EA in November 2000. 66 Fed.Reg. at 38,648. Approximately a month later, the December 2000 easement agreement stated that DOE had begun the required environmental review and that the easement would not become effective until DOE completed the NEPA process. Def.'s App. 37. Because the mitigation costs of environmental circumstances that would be identified during the NEPA process remained unknown until the completion of certain environmental documents, DRPPFUF ¶ 13, "MNS retained the sole and absolute right to approve any costs required to comply with the environmental assessment," DRPPFUF ¶ 9.

By March 2001, a draft EA was completed. 66 Fed.Reg. at 38,649. Based on issues raised, DOE determined that the EA would not support a Finding of No Significant Impact and published a notice of intent to prepare an EIS in the Federal Register on July

25, 2001. *Id.* An April 2002 draft EIS indicated:

> The U.S. Air Force has concerns that the proposed action, or any of the action alternatives may cause disturbance to radio frequency transmissions that would interfere with their training operations on the [Nevada Test Site]. Potential impacts and mitigations to training operations will be analyzed by decision makers in a classified appendix to this EIS.

App. to Def.'s Resp. to Pl.'s Mot. for Summ. J. 58. "On July 3, 2002, the U.S. Air Force wrote a letter to the [DOE] Manager ... which indicated, based on the results of a classified study, that the presence of large wind turbines on the [Nevada Test Site] would be incompatible with the mission of the of the [U.S. Air Force Nevada Test and Training Range]." 68 Fed.Reg. 1448. The U.S. Air Force expressed concern that "impacts caused by wind turbines could adversely affect national security." *Id.* On July 5, 2002, "[b]ased on the concerns articulated by the Air Force, the Administrator of NNSA decided to cancel consideration of the wind farm proposal on the [Nevada Test Site]." *Id.*

Shortly thereafter, by letter dated July 12, 2002, DOE informed the NTSDC that the project would not proceed. App. to Compl., Exhibit E. In that letter, DOE explained, "the National Security impacts identified by the Air Force are so significant that further action with respect to the NEPA process is unwarranted. [DOE] is hereby notifying you that development of the project will not be allowed to go forward." *Id.* On January 10, 2003, DOE published a notice in the Federal Register that it was withdrawing its intent to prepare an EIS, explaining:

> On July 5, 2002, [a DOE official] decided to cancel consideration of the wind farm proposal on the [Nevada Test Site] due to potentially significant adverse impacts to national security missions of the U.S. Air Force.... Therefore, further processing of the preliminary draft EIS, which was under review in [DOE], is no longer warranted. The notice of intent to prepare an EIS is withdrawn and the NEPA process is hereby terminated.

68 Fed.Reg. 1448. On October 15, 2004, MNS Wind filed its Complaint in this Court, alleging that DOE breached the easement agreement when it terminated the project for national security reasons but refused to pay eminent domain compensation. Compl. ¶¶ 57, 65.

## II. Discussion

### A. Standard of Review

■ Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the U.S. Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome; an issue is genuine if a reasonable trier of fact could find for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### B. DOE Breached the Easement Agreement When It Failed to Complete the NEPA Process, a Condition Precedent That It Had Agreed to Perform.

■ As part of the easement agreement, "DOE and the Grantee agree[d] that this Grant of Easement [would] not become effective until DOE [had] completed the NEPA process." Def.'s App. 37. It is undisputed that completion of the NEPA process was a condition precedent to contract formation. Def.'s Mot. for Summ. J. ("Def.'s Mot.") 4; Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot.") 17. According to the Government, because completion of the NEPA process "was a condition precedent to the formation of a contract ... and that condition was not met, no contract ... was formed." Def.'s Mot. 11. "In the absence of a contract, MNS Wind lacks any legal remedy," the Government argues. *Id.* at 1. MNS Wind counters that the law does not permit a party to escape liability by preventing a condition's occurrence. Pl.'s Mot. 17.

■ Indeed, the Government's application of the law is incomplete. While true that the nonoccurrence of a condition precedent generally leaves neither party liable, a clear

exception arises when one party has undertaken a duty to perform the condition. *See Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir.1992) ("The failure to perform a condition precedent may be construed as a breach of contract."). Williston explains:

As a general principle, unless the party whose performance is subject to the condition has undertaken to bring the conditioning event about, nonperformance of a condition precedent is not a breach of contract, since the purpose of the condition is merely to qualify the duty to perform immediately. However, failure to perform a condition precedent will be deemed as a breach of contract, where the performance of the condition is within the control of a party to the agreement, for that party then promises or undertakes that the condition shall occur, and must use "reasonable efforts" to bring the event to pass.

23 Richard A. Lord, Williston on Contracts § 63:6 (4th ed.); *see also* Restatement (Second) of Contracts § 225(3) (1981) ("Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.").

Here, completion of the NEPA process was entirely within DOE's control. *See, e.g.,* Def.'s Mot. 8 ("DOE required to complete its NEPA review"). Even within the easement agreement, concomitant with the condition precedent, DOE expressly assumed an obligation to complete the NEPA process:

DOE is preparing an Environmental Assessment (EA) for this Grant of Easement pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq. DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process. After DOE has completed the

EA and considered the environmental impacts of this action, *DOE will either issue a Finding of No Significant Impact or prepare an Environmental Impact Statement.*

Def.'s App. 37 (emphasis added). Either a Finding of No Significant Impact or an Environmental Impact Statement would have completed the NEPA process. *See* 40 C.F.R. § 1501.4. Thus, in agreeing that "DOE will" issue one of those two documents, DOE effectively promised to complete the NEPA process. Def.'s App. 37. When the Government refused to issue either, it broke a promise and breached the easement agreement.

■ The Government insists that "DOE made no promises about NEPA approval of the project." Def.'s Resp. to Pl.'s Mot. 9. But the word "approval" is out of place beside "NEPA." NEPA does not contemplate approvals or disapprovals, only the procedures agencies must follow before exercising their authority. *See Amber Res. Co. v. United States*, 538 F.3d 1358, 1375 (Fed.Cir.2008) ("NEPA is merely a procedural statute—it requires the agency to consider the environmental effects of its actions, but does not grant rights"). Even the Government acknowledges, "NEPA ... requires an agency only to follow certain procedures designed to lead to well-informed decisions." Def.'s Resp. to Pl.'s Mot. 9. The NEPA process may well convince an agency to abandon its plans. It does not, however, provide some avenue by which an agency can extricate itself from existing contractual liabilities without accepting the consequences those decisions would otherwise carry.[1]

### III. Conclusion

By refusing to complete the NEPA process, the Government breached the easement agreement. Plaintiff's Motion for Partial

---

1. Not surprisingly, the Government has identified NEPA regulations that prohibit agencies, including DOE, from "commit[ting] resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f); Def.'s Reply to Pl.'s Opp'n 5. However, the Government has not shown that the easement agreement committed resources in a way that prejudiced DOE's decision on the project. Tellingly, DOE ultimately elected to terminate the project

notwithstanding the easement agreement. According to the Government's own version of the facts, it is clear that DOE would have made the same decision regardless of whether compensation was due under the agreement. *See* Def.'s Reply to Pl.'s Proposed Findings of Uncontroverted Fact in Support of Pl.'s Opp'n to Def.'s Mot. ¶ 3, Dec. 22, 2005 ("General Gordon merely stated that *if* such compensation were due, DOE would comply." (emphasis in original)).

Summary Judgment as to liability is granted. Defendant's Motion for Summary Judgment is denied.